**STATE of Missouri, Respondent,**

v.

**Beau D. BRADSHAW, Appellant.**

**No. WD 57922.**

Missouri Court of Appeals, Western District.

March 29, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 28, 2002.

Application for Transfer Denied Aug. 27, 2002.

Kent Denzel, Columbia, MO, for appellant.

John M. Morris, III, Andrea Mazza Follett, Assistant Attorney General, Jefferson City, MO, for respondent.

Before SPINDEN, C.J.,
LOWENSTEIN, ULRICH,
BRECKENRIDGE, SMART, ELLIS,
EDWIN H. SMITH, HOWARD,
NEWTON, HOLLIGER, and
HARDWICK, JJ.

**BRECKENRIDGE, Judge.**

Beau Bradshaw appeals his conviction and sentence for stealing anhydrous ammonia in violation of § 570.030.4, RSMo 2000.[1] On appeal, Mr. Bradshaw claims that the evidence was insufficient to support his conviction because the State failed to prove that the anhydrous ammonia was stolen with the intent to use it to manufacture methamphetamine. He also claims that the trial court erred in overruling his application for change of venue under Rule 32.03, and that the trial court plainly erred in overruling his motion to suppress statements he made to the police and evidence the police found in his car. This court finds that the State was not required to prove that the anhydrous ammonia was stolen with the intent to use it to manufacture methamphetamine, and there was sufficient evidence of the essential elements of the offense to support the conviction. This court also finds that Mr. Bradshaw waived his right to a change of venue by proceeding to trial without objection. Finally, this court finds that there was probable cause to arrest Mr. Bradshaw, so the trial court did not plainly err in admitting the statements he made to the officers and the radio found in his car after his arrest. The judgment of the trial court is affirmed.

**Factual and Procedural Background**

On appeal from a criminal conviction, this court reviews the evidence, and any inferences therefrom, in the light most favorable to the jury's verdict. *State v. Mann*, 23 S.W.3d 824, 827 (Mo.App.2000). On August 30, 1998, at around 10:00 P.M., officers from the Missouri State Highway Patrol, and Vernon and Barton Counties, were conducting a surveillance operation

---

1. All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

at Metz Grain near Sheldon. The purpose of the surveillance operation was to reduce the theft of the fertilizer anhydrous ammonia, which is also used to manufacture methamphetamine.

During the surveillance, Lieutenant Detective Ron Peckman, of the Vernon County Sheriff's Department, watched the tanks from his patrol car, which was parked approximately 100 yards from the tanks. Deputy Paul Evitt of the Vernon County Sheriff's Department and Trooper Clinton Tyler Moreland of the Missouri State Highway Patrol were watching from behind the tanks. Lieutenant Peckman noticed a car drive by the tanks, slow down almost to a stop, and then quickly drive away. Lieutenant Peckman radioed Deputy Evitt and Trooper Moreland, who told him that a man, who was later identified as Terry King, had gotten out of the car, and was filling a red tank with Metz Grain's anhydrous ammonia.

When several of the officers approached Mr. King, Mr. King ran into a nearby soybean field. The officers caught Mr. King, who was carrying a two-way radio transmitter in addition to the tank of anhydrous ammonia. Lieutenant Peckman then questioned Mr. King about the person driving the car that dropped him off at the anhydrous ammonia tanks. Mr. King told Lieutenant Peckman and Highway Patrol Corporal Michael Stone that he and the driver of the car were "there to steal the anhydrous" to take it to another individual so they could make some methamphetamine. Although he did not know the name of the driver of the car, Mr. King said that he had the radio transmitter "to talk back to the guy in the car to tell him [when he was] done." Mr. King said that the driver of the car was supposed to come back to get him about an hour after he dropped him off.

Corporal Stone then left to patrol the area to look for the car, which Mr. King had said was white. While Lieutenant Peckman continued questioning Mr. King, a car drove by very slowly, and Mr. King said, "That's the vehicle." After the car drove by again and Mr. King identified it for the second time, Lieutenant Peckman radioed the Highway Patrol. Lieutenant Peckman told Corporal Stone that the suspect was a white male, who was driving a white Chevy.

Corporal Stone saw a car matching the same description drive by, and Corporal Stone signaled the driver of the car to pull over. Corporal Stone approached the car, opened the driver's side door, and ordered the driver, who was Mr. Bradshaw, to step out of the car. When Mr. Bradshaw got out of the car, Corporal Stone saw the ear piece to a radio transmitter sticking out from under the seat. Corporal Stone arrested Mr. Bradshaw, and informed him of his *Miranda*[2] rights.

Barton County Sheriff William Griffitt drove to the location where Corporal Stone had arrested Mr. Bradshaw. When Sheriff Griffitt arrived, Corporal Stone showed him the radio transmitter he had found in Mr. Bradshaw's car. The radio transmitter found in Mr. Bradshaw's car and the radio transmitter Mr. King had been carrying were set to the same frequency.

As he was walking Mr. Bradshaw to one of the patrol cars, Sheriff Griffitt told Mr. Bradshaw, "It's pretty obvious what's going on here." Sheriff Griffitt then asked Mr. Bradshaw what he intended to do with the anhydrous ammonia. Mr. Bradshaw told Sheriff Griffitt that "[i]t was to make methamphetamine with." He also told the sheriff that he was going to get $500 for it. Sheriff Griffitt took Mr. Bradshaw back to

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Corporal Stone, and told Corporal Stone that Mr. Bradshaw had told him "that they were stealing anhydrous ammonia to make meth with, and that they were going to get $500 for the anhydrous ammonia." Mr. Bradshaw then told Corporal Stone, "That's what we were doing."

Mr. Bradshaw was later charged by information with the class D felony of stealing, in violation of § 570.030.4. A jury found Mr. Bradshaw guilty, and recommended that Mr. Bradshaw be sentenced to five years in prison and fined. The court then sentenced Mr. Bradshaw to five years in prison and fined him $5000. Mr. Bradshaw filed this appeal.

### Sufficient Evidence Supports Conviction

■ In his first point, Mr. Bradshaw argues that the trial court erred in overruling his motion for judgment of acquittal at the close of the evidence because the evidence was insufficient to support his conviction. When considering the sufficiency of the evidence to support a criminal conviction, this court's function is limited to a determination of whether there was sufficient evidence upon which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Black,* 50 S.W.3d 778, 788 (Mo. banc 2001).

Mr. Bradshaw was convicted of violating § 570.030.4. This statute provides:

> 4. If an actor appropriates any material with a value less than one hundred fifty dollars in violation of this section with the intent to use such material to manufacture, compound, produce, prepare, test or analyze amphetamine or methamphetamine or any of their analogues, then such violation is a class D felony. The theft of any amount of anhydrous ammonia is a class D felony.

Mr. Bradshaw argues that the State failed to produce sufficient evidence to convince the jury that either he or Mr. King intended to use the anhydrous ammonia to manufacture methamphetamine. Mr. Bradshaw argues that the evidence was that he and Mr. King intended to transfer the anhydrous ammonia to others for money, and that these other persons would use the material to make methamphetamine. The State contends that it did not have to prove that either Mr. Bradshaw or Mr. King stole the anhydrous ammonia with the intent to produce methamphetamine because the stealing of any amount of anhydrous ammonia is itself a class D felony, regardless of the intent with which it was stolen. The first issue this court must decide, then, is whether the legislature intended that the intent to use anhydrous ammonia to manufacture methamphetamine be a necessary element of stealing anhydrous ammonia under § 570.030.4.

■ To determine the legislature's intent, this court looks to the plain and ordinary meaning of the language used in the statute. *State v. Stottlemyre,* 35 S.W.3d 854, 859 (Mo.App.2001). The plain and ordinary meaning of language is generally found in the dictionary. *State v. Hibler,* 5 S.W.3d 147, 149 (Mo. banc 1999). "Where language of a statute is clear, courts must give effect to the language as written." *Kearney Special Road Dist. v. County of Clay,* 863 S.W.2d 841, 842 (Mo. banc 1993). Courts are not permitted to read into a statute a legislative intent that is contrary to the intent made evident by the statute's plain language. *Id.* Moreover, "[t]he courts 'may not engraft upon the statute provisions which do not appear in explicit words or by implication from other language in the statute.'" *State v. Oris,* 892 S.W.2d 770, 772 (Mo.App.1995) (quoting *Wilson v. McNeal,* 575 S.W.2d 802, 810 (Mo.App.1978)).

Looking at the plain language of § 570.030.4, the second sentence of that subsection specifically mentions the theft of anhydrous ammonia, stating, "The theft of any amount of anhydrous ammonia is a class D felony." The dictionary definition of "theft" is "the act of stealing[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2369 (1971). "Stealing" is defined earlier in the statute, in 570.030.1. This subsection provides that "[a] person commits the crime of stealing if he or she appropriates property or services of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." Section 570.030.1. The only intent required to commit the act of stealing is the intent to deprive the owner of the property or services being appropriated. Thus, under the plain language of the second sentence of § 570.030.4, to commit the crime of stealing anhydrous ammonia, the only intent required is that the person appropriating the anhydrous ammonia intend to deprive the owner of it.

Mr. Bradshaw argues, however, that this sentence must be read in conjunction with the first sentence of § 570.030.4. The first sentence of § 570.030.4 provides that "[i]f an actor appropriates any material with a value of less than $150 in violation of this section with the intent to use such material to manufacture, compound, produce, prepare, test or analyze amphetamine or methamphetamine or any of their analogues, then such violation is a class D felony." Because the second sentence concerning stealing anhydrous ammonia appears in the same subsection as the first sentence, which requires stealing material with the intent to use it to manufacture methamphetamine, Mr. Bradshaw argues that the stealing of the anhydrous ammonia also must be done with the intent to use it to manufacture methamphetamine.

■ It is true that when interpreting statutory language, courts must consider the language in the context of the whole statute and in light of the statute's object and purpose. *State v. Duffy*, 8 S.W.3d 197, 202 (Mo.App.1999). Because anhydrous ammonia is a necessary ingredient in the manufacture of methamphetamine, *State v. Motley*, 976 S.W.2d 502, 504 (Mo. App.1998), *overruled on other grounds by State v. Withrow*, 8 S.W.3d 75, 79 n. 3 (Mo. banc 1999), the context of § 570.030.4 is the criminalization of stealing materials that can be used in the manufacture of methamphetamine.

■ To aid in determining legislative intent from a statute, this court may consider the problems the legislature sought to remedy, and the circumstances and conditions that existed at the time of the statute's enactment. *Wallace v. Van Pelt*, 969 S.W.2d 380, 383 (Mo.App.1998). Anhydrous ammonia is different in nature than the other materials used to manufacture methamphetamine. Other materials that are commonly used in the manufacture of methamphetamine, such as ephedrine or pseudoephedrine (found in cold pills), lithium batteries, alcohol, distilled water, coffee filters, glassware, and rubber tubing[3] all have legitimate household or other lawful uses. Since a legitimate use exists for these materials, it is reasonable that the legislature would require the State to prove that these materials were stolen with the intent to use them to manufacture methamphetamine in order to

---

**3.** *See Withrow*, 8 S.W.3d at 77 (describing materials used in the manufacture of methamphetamine).

**22**

raise the theft from a class A misdemeanor[4] to a class D felony.

Anhydrous ammonia, on the other hand, is a fertilizer used in farming, and has been recognized by the legislature as a potentially hazardous material. Section 266.355 requires the director of the state's department of agriculture to promulgate and "enforce regulations setting forth minimum general standards covering the design, construction, location, installation, and operation of equipment for storing, handling, transporting ... and utilizing anhydrous ammonia." Likewise, § 302.700.2(19) of the Uniform Commercial Driver's License Act provides that anhydrous ammonia is considered a hazardous material unless transported by a "farm vehicle," as that term is defined in § 302.700.2(16).[5] Because the legitimate use of anhydrous ammonia is as a fertilizer, and not as a common household item, and anhydrous ammonia has the potential to be a hazardous material when not handled, utilized, or transported according to prescribed regulations, it is reasonable that the legislature would not require the State to prove that the stealing of anhydrous ammonia, a necessary ingredient in making methamphetamine, was done with the intent to manufacture methamphetamine.

The legislature's subsequent amendment of § 570.030.4 supports this interpretation. This court may consider subsequent amendments to a statute "to ascertain the uniform and consistent purpose of the legislature." *Mo. Hosp. Ass'n v. Air Conservation Comm'n*, 874 S.W.2d 380, 398 (Mo.App.1994) (citing *State v. Thomas*, 351 Mo. 804, 810, 174 S.W.2d 337, 340 (Mo. banc 1943)). In 2001, the legislature amended § 570.030.4. With the amended portion in italics, the statute now reads:

4. If an actor appropriates any material with a value less than one hundred fifty dollars in violation of this section with the intent to use such material to manufacture, compound, produce, prepare, test or analyze amphetamine or methamphetamine or any of their analogues, then such violation is a class D felony. *The theft of any amount of anhydrous ammonia or liquid nitrogen,*[6] *or any attempt to steal any amount of anhydrous ammonia or liquid nitrogen, is a class C felony. The theft of any amount of anhydrous ammonia by appropriation of a tank truck, tank trailer, rail tank car, bulk storage tank, field (nurse) tank or field applicator is a class A felony.*

The amendment to § 570.030.4 increases the penalty for stealing anhydrous ammonia to a class C felony, and sets the penalties for two other crimes involving the theft of anhydrous ammonia that were

4. Section 570.030.7 provides that "[a]ny violation of this section for which no other penalty is specified in this section is a class A misdemeanor."

5. Section 302.700.2(16) defines a "farm vehicle" as:

[A] commercial motor vehicle controlled and operated by a farmer used exclusively for the transportation of agricultural products, farm machinery, farm supplies, or a combination of these, within one hundred fifty miles of the farm, other than one which requires placarding for hazardous materials as defined in this section, or used in the operation of a common or contract motor carrier, except that a farm vehicle shall not be a commercial motor vehicle when the total combined gross weight rating does not exceed twenty-six thousand one pounds when transporting fertilizers as defined in subdivision (19) of this subsection[.]

6. Anhydrous ammonia is also known as liquid nitrogen. *U.S. v. Morrison*, 207 F.3d 962, 964 (7th Cir.2000).

not previously specified in the statute—the attempt to steal anhydrous ammonia, and the theft of anhydrous ammonia by the appropriation of one of the listed means. None of the provisions that specifically concern the theft of anhydrous ammonia in the amended version of § 570.030.4 refer back to the first sentence of the subsection, nor do the anhydrous ammonia provisions indicate that the theft of the chemical must be done with the intent to manufacture methamphetamine, amphetamine, or any of their analogues. Rather, the amendment to the statute is further evidence that, because of the nature of anhydrous ammonia, the legislature intended to treat the theft of anhydrous ammonia differently than the theft of other ingredients that can be used in the manufacture of methamphetamine.[7]

To summarize, this court finds that the context of the prior version of § 570.030.4 does not change the express meaning of the sentence, "The theft of any amount of anhydrous ammonia is a class D felony." The plain language of the statute does not require the State to prove that the theft of the anhydrous ammonia was done with the intent to use it to manufacture methamphetamine. The legislature included this provision in the subsection concerning the theft of materials used to manufacture methamphetamine, amphetamine, or their analogues because anhydrous ammonia is an ingredient used in the manufacture of methamphetamine. Because, unlike the other materials used to make methamphetamine, anhydrous ammonia is a potentially hazardous material whose only legitimate use is as a fertilizer, and it is, in fact, a necessary ingredient in the manufacture of methamphetamine, it is reasonable that the legislature did not intend to require the State to prove that anhydrous ammonia was stolen with the intent to manufacture methamphetamine. Thus, this court finds that § 570.030.4 did not require the State to prove that Mr. Bradshaw or Mr. King stole the anhydrous ammonia with the intent to manufacture methamphetamine.

Mr. Bradshaw contends that, even if the statute did not require the State to prove that he and Mr. King stole the anhydrous ammonia with the intent to use it to manufacture methamphetamine, the State's inclusion of the intent to use the anhydrous ammonia to produce methamphetamine in the information and the verdict director required the State to prove it as an element of the offense of stealing anhydrous ammonia. In the information charging Mr. Bradshaw with the class D felony of stealing under § 570.030, the State alleged that Mr. Bradshaw "appropriated anhydrous ammonia from Metz Grain, without their consent, intending to use it for the production of methamphetamines." Mr. Bradshaw does not attack the validity of the information. Instead, he argues that the State did not prove the intent alleged in the information beyond a reasonable doubt. Section 545.030.1 states, in pertinent part:

No indictment or information shall be deemed invalid, *nor shall the trial, judgment or other proceedings thereon be ... in any manner affected:*

. . . .

---

7. In 2001, the legislature added two more statutes concerning anhydrous ammonia. Section 578.154, RSMo Cum.Supp.2001, makes possession of any amount of anhydrous ammonia in a container other than one approved by the Missouri Department of Agriculture or the United States Department of Transportation a class D felony, while § 537.297, RSMo Cum.Supp.2001, sets forth a cause of action for tampering with anhydrous ammonia. These new statutes are additional evidence of the legislature's recognition that anhydrous ammonia is a hazardous material when possessed or used unlawfully.

(14) For any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged; nor .

. . . .

(18) For any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits.

(Emphasis added.)

 As this court has found, the intent to use anhydrous ammonia to manufacture methamphetamine is not an element of the crime of stealing anhydrous ammonia under § 570.030.4. Thus, the inclusion of the phrase "intending to use it for the production of methamphetamine" is surplusage. Surplusage is defined as "the inclusion of words or phrases which are unnecessary to charge the statutory elements of the offense." *State v. Hodges,* 829 S.W.2d 604, 607 (Mo.App.1992). The inclusion of surplusage in the charging instrument cannot affect the outcome of the trial. *See State v. Smith,* 944 S.W.2d 901, 917 (Mo. banc 1997) (rejecting a defendant's claim that the State failed to prove the cause of deaths alleged in an indictment for first degree murder because the State's inclusion of the description of the mortal wounds in the indictment was surplusage). Moreover, Mr. Bradshaw's defense at trial was misidentification, not lack of intent to use the anhydrous ammonia to manufacture methamphetamine. Therefore, the State's erroneously including intent to produce methamphetamine in the information did not result in prejudice to Mr. Bradshaw's substantial rights upon the merits. Section 545.030.1(18).

Finally, the verdict director, which was submitted by the State, instructed the jury, in pertinent part:

If you find and believe from the evidence beyond a reasonable doubt:

First, that on the 30th day of August, 1998, in the County of Vernon, State of Missouri, Terry King took anhydrous ammonia owned by Metz Grain, and

Second, that Terry King did so without the consent of Metz Grain, and

Third, that Terry King did so for the purpose of withholding it from the owner permanently, and

Fourth, that the defendant or Terry King intended to use the anhydrous ammonia to manufacture methamphetamine,

then you are instructed that the offense of felony stealing has occurred, and if you further find a[sic] believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the commission of that felony stealing, the defendant acted together with or aided Terry King in committing that offense, then you will find the defendant guilty of the felony of stealing.

 An intent, on the part of Mr. Bradshaw or Mr. King, to use the anhydrous ammonia to manufacture methamphetamine was an unnecessary element to convict Mr. Bradshaw of stealing anhydrous ammonia under § 570.030.4. To require reversal, however, instructional error must prejudice the defendant. *State v. Livingston,* 801 S.W.2d 344, 350 (Mo. banc 1990). Here, the necessary elements for finding Mr. Bradshaw guilty of stealing anhydrous ammonia were submitted to the jury, and the jury must have affirmatively found each element. Even assuming, *arguendo,* that the State failed to prove that either Mr. King or Mr. Bradshaw intended to use the stolen anhydrous ammonia to manufacture methamphetamine, Mr. Bradshaw was not prejudiced by the inclusion of the element in the instruction. *See State v. Blackmon,* 587 S.W.2d 292, 294 (Mo.App.1979) (stating

that "[u]nless it may be presumed or inferred that the jury's affirmative finding of an unnecessary but unproved element Per se demonstrates misconduct or confusion as to the other elements, we are unable to find prejudice in this situation."). Since the additional submitted element of intent to manufacture methamphetamine was unnecessary to establish the crime of stealing anhydrous ammonia under § 570.030.4, its inclusion, "whether supported by evidence or not," could not have resulted in prejudice to Mr. Bradshaw. *Id.* "If the instruction was erroneous it was not prejudicially so." *Id.*[8]

Because § 570.030.4, the statute defining the stealing of anhydrous ammonia, did not require the State to prove that either Mr. Bradshaw or Mr. King stole the anhydrous ammonia with the intent to use it to manufacture methamphetamine, the inclusion of the intent element in the instruction was unnecessary surplusage. As the evidence supporting the necessary elements of stealing anhydrous ammonia was sufficient to find Mr. Bradshaw guilty beyond a reasonable doubt, Mr. Bradshaw suffered no prejudice from the inclusion of the unnecessary element in either the information or the instruction. Mr. Bradshaw's first point is denied.

### Right to Change of Venue Waived

In Mr. Bradshaw's second point, he claims that the trial court erred in overruling his application for change of venue and proceeding to trial in Vernon County. Mr. Bradshaw asserts that he timely filed an application for change of venue under Rule 32.03 and that, in violation of the provisions of the Rule which require that the trial court "immediately shall" grant a timely motion, the trial court failed to rule on the application prior to the day of trial.[9] Mr. Bradshaw argues that the trial court further erred by refusing to grant his application for change of venue when he brought the application to the court's attention before the jury was sworn and jeopardy attached, which he characterizes as being before the case "had ... proceeded to trial." Mr. Bradshaw also claims that there was no conduct by him that "manifested an intent to withdraw, abandon, or waive the application."

Mr. Bradshaw was arraigned and entered his initial plea of not guilty on November 24, 1998. His counsel timely filed a joint application for change of judge and venue on November 25, 1998. Mr. Bradshaw gave notice in his application that the joint application for change of judge and venue would be presented to the court on December 8, 1998. On that date, the court

---

**8.** This court recognizes that the court in *Blackmon,* 587 S.W.2d at 294–95, and the court in *State v. Mason,* 657 S.W.2d 40, 42–43 (Mo.App.1983), another case involving the submission of an unnecessary element, went on to address the sufficiency of the evidence to support the unnecessary element. To do so was *dicta,* however, as both courts had already found that the submission of the unnecessary element was not prejudicial to the defendant and *Blackmon,* in particular, had found that the submission of the unnecessary element, "whether supported by evidence or not, could not have prejudiced defendant." 587 S.W.2d at 294.

**9.** Mr. Bradshaw's point relied on also includes a claim that his "rights to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Missouri Constitution" were violated. He did not raise this constitutional claim before the trial court. His failure to assert a constitutional claim at the earliest opportunity waives the claim. *State v. Knifong,* 53 S.W.3d 188, 192 (Mo.App.2001). In addition, Mr. Bradshaw did not address his constitutional claim in the argument portion of his brief, so the claim would be considered abandoned. *State v. Khoshaba,* 878 S.W.2d 472, 475 (Mo.App. 1994).

granted the application for change of judge, and the next day a judicial transfer request was made to the Supreme Court. On January 4, 1999, the Supreme Court assigned the Honorable Joseph B. Phillips, Associate Circuit Judge of Cedar County, to the case. At a conference on March 4, 1999, attorneys for both parties appeared before Judge Phillips and the case was set for trial on June 3 and 4, 1999. The case was continued from that trial setting and two subsequent trial settings, and the trial was ultimately held on October 1, 1999.

On the day of trial, the court first heard arguments on the defendant's motion to suppress statements and evidence, and overruled the motion. Prior to commencing voir dire, the court inquired of the prosecutor and defense counsel if they were ready to proceed, and Mr. Bradshaw's counsel responded affirmatively. Thereafter, the jury was seated, each attorney conducted his voir dire examination of the venirepersons and a jury was selected. Immediately after the court told the circuit clerk to call and seat the jury, defense counsel raised the issue of Mr. Bradshaw's application for a change of venue. Defense counsel asked that the trial court grant a change of venue. The trial court denied the request, finding that Mr. Bradshaw's motion for change of venue had been waived by the conduct of the parties. The statements of defense counsel, the prosecutor and the court concerning the motion for change of venue were as follows:

[Defense counsel]: I noticed from my previous counsel's court file that the change of judge and change of venue motion was brought up on December 8th, and in her court file it was change of venue to Cedar County and change of judge. Did you get that on the record?

[Prosecutor]: A judgment entry does not—

The Court: You're saying that we should not have this thing going here? Let's see.

[Defense counsel]: That's—

The Court: Well, let me see if I can see what the docket says here. We've got a change of venue filed November 25,- '98. 12/8/98, P.A. and Defendant appear, grants change of judge and request clerk to notify Supreme Court. I—Supreme Court on January 8, '98, advises that I was appointed. January 26 set for conference March 4th. March 4th, attorneys schedule jury trial 6/3/99, beginning at 9:00 a.m. I show attorneys appear.

And I show a motion for continuance and notice filed on May 18th. And case continued, as P.A. did not object. Apparently, it was the Defendant's motion to continue and reset to 6/21 at 9:00 a.m. The jury clerk sent— The jury clerk sent notice June 7th. Motion to suppress is filed. Case set for jury trial 7/26. June 24th, P.A. and [defense attorney] appear, hearing on motion to suppress. Motion denied. July, a brief in support of motion to suppress filed. 7/26, P.A. and [defense counsel] appear. Case reset for jury trial 10/1/99 at 9:00 a.m. And that's today.

[Defense counsel], I believe—I'm not sure what I would have done yesterday, but it appears to me at this point in time you-that it's your Defendant's motion for change of venue, and I think we've proceeded. And at some at [sic] point in time it's not uncommon that—that the public defender filed motion for change of judge and change of venue and then withdraws the change of venue. And at some point in time, we must have—

somebody—I think it's waived by everybody's actions at this point. So I've got a jury and I've got them picked, and we may be wrong, but I guess we'll try it today.

After this discussion and ruling by the court, the jurors were brought into the courtroom, administered the oath, and the trial continued.

Mr. Bradshaw bases his claim of error upon the language of Rule 32.03, which provides that a defendant in a criminal proceeding that is pending in a county having seventy-five thousand or fewer inhabitants shall have a right to a change of venue without demonstrating cause, if the case is triable by a jury and the defendant filed an application not later than ten days after the initial plea was entered. The Rule further provides that "if a timely application is filed, the court *immediately shall order* the case transferred to some other county." While Mr. Bradshaw correctly states the content of Rule 32.03, that is not the Rule that controls his application for change of venue.

■■ Mr. Bradshaw filed a joint application for change of judge and change of venue. While 32.03 governs changes of venue as a matter of right, Rule 32.08 governs joint applications. The provisions of Rule 32.08 differ from those of Rule 32.03 because of the nature of the joint application. Under Rule 32.08, the trial judge presiding over the case at the time the joint application is filed can only sustain the application for change of judge, and cannot address the application for change of venue. *See State v. Cella,* 976 S.W.2d 543, 552 (Mo.App.1998). Rule 32.08(d) provides that the newly assigned judge "shall determine the request for change of venue," so the application for change of venue cannot be considered until a new judge is assigned. In its entirety, Rule 32.08 reads:

(a) If a party requests and obtains either a change of venue or a change of judge, except a change of judge pursuant to Rule 32.06, that party shall not be granted any additional change thereafter except as provided in Rule 32.09(c) or Rule 32.10. A defendant who desires both a change of venue and a change of judge, except a change of judge pursuant to Rule 32.06, must join both requests in a single application.

(b) A copy of the application and notice of the time when it will be presented to the court shall be served on all parties.

(c) Upon the timely presentation of an application requesting a change of judge and a change of venue and if no such application has previously been made by the requesting party, the judge promptly shall sustain the application for change of judge and transfer the case in accordance with the procedures of Rule 32.07(d).

(d) The newly assigned judge shall determine the request for change of venue. If the change of venue is a matter of right, the assigned judge may order the change of venue without the judge's appearance in the county from which the change is taken after giving all parties an opportunity to make suggestions as to where the case should be sent.

(e) If the application for change of venue is granted, the judge shall order the change of venue. If the change of venue is denied or if the change of venue is to another county in the same circuit, the newly assigned judge shall continue to be the judge in the criminal proceeding.

Rule 32.08(d) does not include any timeliness requirement for the newly assigned judge to rule on the application for change of venue, in contrast with Rule 32.03(c)'s

requirement that "the court immediately shall order the case transferred to some other county," and Rule 32.08(c)'s requirement that "the judge promptly shall sustain the application for change of judge." Even without a timeliness requirement, however, Rule 32.08(d) imposes upon the newly appointed judge a duty to "determine the request for change of venue."

 Despite the duty imposed by Rule 32.08(d) upon the newly appointed judge to determine the request for change of venue, "[a] defendant in a criminal case may expressly or by acts and conduct waive statutory and constitutional provisions conferred for his protection." *State v. Harmon*, 243 S.W.2d 326, 328 (Mo.1951). It has long been held that "[t]he granting of a change of venue of the place of trial is a statutory privilege which may be waived." *State v. Brookshire*, 353 S.W.2d 681, 683 (Mo.1962).[10] A defendant's failure to object to the action of the court in ordering a change of venue acts to waive the defendant's right to a particular venue. *State v. Naves*, 185 Mo. 125, 84 S.W. 1, 3 (1904). Furthermore, this waiver can occur "either before or after the order has been entered." *Brookshire*, 353 S.W.2d at 683–84. *Harmon, Brookshire* and *Naves* were decided prior to the adoption of Rule 32.03, which allows for a change of venue as a matter of right without a showing of prejudice or bias on the part of the inhabitants. Since a change of venue as a matter of right has less potential for prejudice to a defendant than a change of venue for cause, the rationale for the general principles set forth in those cases should apply. In fact, in *State v. Purdy*, 766 S.W.2d 476, 478 (Mo.App.1989), the Eastern District of this court applied the rule of *Harmon* to a

waiver of change of judge, after the adoption of Rule 32. Therefore, this court holds that a defendant's right to a change of venue under Rule 32.03 can be waived by failure to object.

While these cases provide that a defendant's right to a change of venue can be waived by failure to object, they do not answer the question as to when that waiver is effective. Neither party cites change of venue cases that establish when a waiver occurs, so this court will follow the rule of analogous cases which concern defendants' challenges to venue related to where the crime was committed, and not to applications for change of venue. *See State v. Barnes*, 942 S.W.2d 362, 368 (Mo. banc 1997); *State v. Wood*, 596 S.W.2d 394, 401 (Mo. banc 1980); *State v. Sullivan*, 935 S.W.2d 747, 757 (Mo.App.1996); *State v. Mack*, 903 S.W.2d 623, 627 (Mo.App.1995); *State v. Morrison*, 869 S.W.2d 813, 814–15 (Mo.App.1994). In that context, the cases hold that a defendant can waive a challenge to venue by proceeding to trial.

Unfortunately, these cases do not establish when a case has "proceeded to trial." In each of the cases except *Wood*, it is clear that the issue of venue was not raised until after, at least, the presentation of evidence by the State. *Barnes*, 942 S.W.2d at 368 (first raised in motion for new trial); *Sullivan*, 935 S.W.2d at 757 (first raised in motion for judgment of acquittal); *Mack*, 903 S.W.2d at 626 (first raised at sentencing hearing); *Morrison*, 869 S.W.2d at 814–15 (raised in motion for judgment of acquittal at the close of the State's case and at the close of all the evidence). In *Wood*, 596 S.W.2d at 401, the opinion states only that defendant "proceeded to trial without objection."

---

**10.** *Brookshire* was decided prior to the Supreme Court's adoption of Rule 32.08, and, thus, referred only to waiver of the *statutory* right to change of venue. This court discerns no reason, however, why this principle would not also apply to the right conferred by the rule.

Thus, these decisions do not aid in determining when, exactly, a defendant has proceeded to trial and waived any challenge to venue.

The trial court found that Mr. Bradshaw had proceeded to trial when he participated in the selection of the jury. Mr. Bradshaw urges that his case had not proceeded to trial because the jury had not been sworn and jeopardy had not attached. Mr. Bradshaw does not cite any cases to support this position, however. A review of cases reveals that many use the phrase "commencement of trial" or its variants rather loosely to indicate various points during the trial process. In three cases, including one Missouri Supreme Court case, the courts' decisions have indicated, although somewhat vaguely, that jury selection is a part of the trial process. In the first two cases, *State v. Barnett*, 584 S.W.2d 617, 618 (Mo.App.1979), and *State v. Coleman*, 582 S.W.2d 335, 336 (Mo.App. 1979), this court used the phrase "at commencement of trial" in reference to the time in which the defendants "moved quashal of the jury venire" based upon the exemption of women from the venire on the account of gender in violation of the Sixth and Fourteenth Amendments. The use of the language "commencement of trial" refers to the time prior to the jury being sworn. *Id.* The Missouri Supreme Court, in the civil case of *Everett v. Morrison*, 478 S.W.2d 312, 313 (Mo.1972), made the use of the phrase more clear. There, the Court stated the "[t]rial commenced . . ., with voir dire and jury selection." *Id.*

In contrast, in four appellate court cases, the phrase has been used in a manner that indicates that the commencement of trial occurs sometime after the jury is selected or empaneled. First, in *State v. Voyles*, 561 S.W.2d 697, 699 (Mo.App. 1978), the court addressed a claim "that the trial court had deprived the jury of its written instructions for seven hours." There, the court used the phrase by stating that "on the second day of trial the jury was inadvertently given only those instructions that the trial court read to them *at the commencement of the trial.*" *Id.* The use of the phrase in that case suggests that the court was referring to the time after which the jury was at least seated.

In *State v. Styles*, 559 S.W.2d 591, 591 (Mo.App.1977), a case in which the defendant alleged that there were pretrial incidents that compromised him before the jury and prejudiced the verdict against him, this court used the phrase by stating that "[t]he complaints were alleged from two episodes between the jail guards and the defendant, one during the process of jury selection and the other after the jury was empaneled, but both before actual commencement of trial." *Styles* incidentally suggests that the selection and empaneling of the jury is not part of trial.

Likewise, in *State v. Young*, 534 S.W.2d 585, 587 (Mo.App.1976), this court used "commencement of trial" to indicate the time after the jury was selected and pretrial matters were disposed. And more recently, this court, in *State v. Baldridge*, 857 S.W.2d 243, 254 (Mo.App.1993), used the phrase "trial commenced" in a manner suggesting that the selection of the jury panel occurs before the time trial commences. In none of these cases, however, was the question when a trial commenced the issue the court was addressing.

Here, what is important is not the term of art, but the significance of the stage of the process to the question before this court. The issue is what event or act operates as a waiver of a defendant's right to a change of venue. Mr. Bradshaw's reliance on the attachment of jeopardy has no relation to the waiver of the right to change of venue.

The issues of when a trial commences and the relevance of the attachment of jeopardy as it relates to other situations were both addressed by this court in *State v. Cullen*, 646 S.W.2d 850, 853 (Mo.App.1982). In *Cullen*, this court rejected a similar argument by a defendant who asserted that a trial does not begin until the jury is sworn. *Id.* There, the defendant challenged that his trial had not commenced within the 180–day period in accordance with Missouri's speedy trial statute, § 545.780. *Id.* This court rejected the defendant's attempt to analogize the commencement of trial for purposes of a speedy trial with that of the attachment of jeopardy, noting that there was "[n]o necessary correlation ... between the beginning of jeopardy and the end of the [180–day] statutory period." *Id.* at 854. This court noted that the question of double jeopardy is "of constitutional dimensions[,]" yet "no question of constitutional import is involved in fixing and defining the certain end of a statutory period." *Id.* Finally, this court stated that "trial judges and lawyers commonly understand the beginning of trial to be that time when the selection of the jury begins. The voir dire is the first regular and usual in-court proceeding on the morning a case is set for trial." *Id.* Thus, the court held that "[t]he trial actually began ... with the swearing of the venire at the commencement of the voir dire examination." *Id.* at 853.

Like the right to a speedy trial under § 545.780, the right to a change of venue under Rule 32.08 evokes no question of constitutional import. *See State v. Perkins*, 339 Mo. 27, 95 S.W.2d 75, 76 (banc 1936). Further, there is no legal justification for requiring that jeopardy attach before a defendant waives objection to venue. The circumstances of this case demonstrate that such a rule would permit a defendant to fail to call the trial court's attention to a pending motion for change of venue, proceed with jury selection and, then, if dissatisfied with the resulting jurors, object to venue. The better rule is to require a defendant to object before the jury panel is sworn for voir dire.

As a point of comparison, former Rule 30.12 (1979), "Disqualification of Judge—Affidavit—When Filed," provided that "[i]f the particular trial judge has not been designated five days before the day the case has been set for trial, then such affidavit must be filed *before the jury panel is sworn for voir dire examination.*" (Emphasis added.) The subject matter of former Rule 30.12 is now covered by Rule 32.07. Rule 32.07(b) currently provides that "[i]f the designation of the trial judge occurs more than ten days after the initial plea is entered, the application shall be filed within ten days of the designation of the trial judge or *prior to the commencement of any proceeding on the record,* whichever is earlier." (Emphasis added.) Both the former and the current Rules recognize that the automatic right to a change of judge, like a change of venue, should be limited to promote the prompt and orderly administration of justice.

When Mr. Bradshaw proceeded with voir dire without objection, he was proceeding with the trial, and he waived his right to a change of venue. Mr. Bradshaw's second point is denied.

### Probable Cause to Arrest

In his third point on appeal, Mr. Bradshaw alleges that Corporal Stone did not have probable cause to arrest him. Mr. Bradshaw asserts that, while the statements Mr. King made to the officers may have amounted to reasonable suspicion to justify the traffic stop, Mr. King's statements did not amount to probable cause permitting Corporal Stone to arrest him. He contends that Mr. King's statements were not sufficiently reliable to amount to

probable cause because Mr. King was a co-perpetrator who had just been arrested. Mr. Bradshaw compares Mr. King to an anonymous informant because the officers did not have a basis to believe Mr. King's statements were reliable. Mr. Bradshaw claims that, since he was illegally arrested, any statements he made and any evidence found, as a result of the illegal arrest, are inadmissible. Therefore, he claims that the trial court should have suppressed the statements he made to the police and the evidence relating to the radio transmitter the officers found in his car.

▆▆▆▆ In his motion to suppress, Mr. Bradshaw alleged that Corporal Stone did not have reasonable suspicion to perform the stop. On appeal, Mr. Bradshaw does not claim a lack of reasonable suspicion to perform the stop but claims, instead, that Corporal Stone did not have probable cause to make the arrest. Because Mr. Bradshaw's motion to suppress asserted that there was no reasonable suspicion for the stop and he now argues that there was no probable cause for the arrest, he did not preserve the issue for review. *State v. Forister*, 823 S.W.2d 504, 511 (Mo.App. 1992). This court reviews errors that are raised for the first time on appeal under the plain error standard. *State v. Malone*, 951 S.W.2d 725, 730 (Mo.App.1997). This court will grant plain error relief only if Mr. Bradshaw suffered a manifest injustice or miscarriage of justice as a result of the alleged error. *State v. Collins*, 42 S.W.3d 736, 740 (Mo.App.2001).

▆▆▆ The Fourth Amendment to the United States Constitution protects persons from unreasonable searches and seizures. *See State v. David*, 13 S.W.3d 308, 311 (Mo.App.2000). "Article I, Section 15 of the Missouri Constitution is coextensive with the Fourth Amendment." *Id.* In determining whether the search and seizure in this case was lawful under the Fourth Amendment, this court must determine whether Corporal Stone had probable cause to arrest Mr. Bradshaw.

▆▆▆ For an officer to make a valid warrantless arrest, the officer must have probable cause to believe that the suspect has committed a crime. *State v. Tackett*, 12 S.W.3d 332, 338–39 (Mo.App.2000). "There is no precise test for determining whether probable cause existed; rather, it is based on the particular facts and circumstances of the individual case." *State v. Clayton*, 995 S.W.2d 468, 477 (Mo. banc 1999). The facts and circumstances justifying probable cause must exist at the time of the arrest. *See State v. Moore*, 659 S.W.2d 252, 255 (Mo.App.1983). For probable cause to exist, there does not need to be absolute certainty, but the facts and circumstances of which the officers have "reasonably trustworthy information [must be] sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *State v. Witte*, 37 S.W.3d 378, 382 (Mo.App.2001) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145 (1964)); *See also Tackett*, 12 S.W.3d at 339. Where probable cause is based upon an informant's statements, the inquiry is not whether the informant's reliability has been previously established, rather it is whether the information is reliable and can be corroborated through other sources. *State v. Busby*, 656 S.W.2d 820, 822 (Mo. App.1983). An identification of a suspect by an accomplice is reliable and may form the basis for probable cause. *Forister*, 823 S.W.2d at 511. " '[P]robable cause is determined by the collective knowledge and the facts available to all of the officers participating in the arrest; the arresting officer does not need to possess all of the available information.' " *Clayton*, 995 S.W.2d at 477 (quoting *State v. Mayweather*, 865 S.W.2d 672, 675 (Mo.App.1993)).

Mr. Bradshaw alleges that Mr. King should be treated as an anonymous infor-

mant, and that the officers did not corroborate the details of the tip before making the stop. He also alleges that State relied solely on hearsay to show grounds for the stop because at the suppression hearing the State did not present Mr. King or the officers who observed Mr. King stealing the anhydrous ammonia. In support of these propositions, he cites *State v. Franklin*, 841 S.W.2d 639, 644 n. 6 (Mo.banc 1992), which states:

If a dispatch is based upon information provided by another police officer, the court looks to whether the collective information known to all officers involved in the stop amounted to reasonable suspicion. If the dispatch is based upon information obtained from an identified informant, courts examine whether the informant was known to the police to be reliable. If the information was obtained from an anonymous informant, the question is whether the police corroborated the details of the tip before making the stop.

(Citations omitted).

■■■ Here, Mr. King was not an anonymous informant; he was an accomplice. Following *Forister*, Mr. King's identification of the man driving the white vehicle as an accomplice provided sufficient probable cause for Mr. Bradshaw's warrantless arrest. *See* 823 S.W.2d at 511 (finding probable cause for a warrantless arrest when "[t]he only information about the defendant's complicity in the crime came to the police through the confession of his accomplice"). While in *Forister* the accomplice gave the defendant's name, Mr. King's specific identification, by stating, "That's the vehicle," was a specific and reliable identification. This finding is consistent with prior holdings that there was proba-

ble cause to make a warrantless arrest when there was an identification of the vehicle or an identification of the vehicle and the suspect. *See State v. Waters*, 855 S.W.2d 413, 416 (Mo.App.1993) (finding probable cause based upon an identification by the victim of the defendant and the truck he was driving, and the fact that the defendant was in the area of the crime); *State v. Whitley*, 743 S.W.2d 482, 484 (Mo. App.1987) (finding probable cause where the victim gave a detailed description of the car and a generalized description of the suspects, and the suspects were seen in the car near the area of the crime); *State v. Harris*, 670 S.W.2d 526, 528 (Mo. App.1984) (finding probable cause for the arrest of a passenger in a van where witnesses positively identified the van).

■■■ Although Mr. King was an accomplice, rather than a victim or a witness, he positively identified the car that Mr. Bradshaw was driving while the commission of the offense was ongoing. Furthermore, Corporal Stone was not relying solely upon a dispatch. He was present when Lieutenant Peckman had a conversation with Mr. King, and heard Mr. King state that he was waiting for a guy in a white car to pick him up.[11] Corporal Stone then was in the area, waiting for a signal from other officers, when Mr. Bradshaw drove by. While Corporal Stone was not present when Mr. King stated, "That's the vehicle," this court looks to the collective knowledge of all the officers. *Clayton*, 995 S.W.2d at 477.

In addition, the circumstances preceding Mr. Bradshaw's arrest demonstrated that Mr. King's information was reliable. There was no other traffic on the road on which Mr. Bradshaw was driving, and Mr. Bradshaw drove by within the time frame

11. Corporal Stone testified to this fact during the hearing on Mr. Bradshaw's motion to suppress. In ruling on a motion to suppress, "this court considers the record made at the suppression hearing as well as the evidence introduced at trial." *State v. Deck*, 994 S.W.2d 527, 534 (Mo. banc 1999).

that Mr. King and the man who dropped him off had agreed. By driving by very slowly and making a U-turn and driving by slowly again, Mr. Bradshaw was acting suspiciously in the area of the crime. *See Waters*, 855 S.W.2d at 416. After Corporal Stone stopped Mr. Bradshaw's vehicle and before he placed Mr. Bradshaw under arrest, Corporal Stone saw the earpiece of a radio transmitter, which he recognized as identical to the radio transmitter that Mr. King had when arrested, sticking out from under Mr. Bradshaw's seat. Therefore, Mr. King's statements were supported by Mr. Bradshaw's suspicious actions and the finding of the radio transmitter, before Corporal Stone placed Mr. Bradshaw under arrest.

These circumstances, known to Corporal Stone and the other officers, were sufficient to warrant a prudent individual to believe that Mr. Bradshaw was committing a criminal offense, so there was probable to arrest Mr. Bradshaw. Because there was probable cause to arrest Mr. Bradshaw, he did not suffer a manifest injustice or miscarriage of justice. Therefore, the trial court did not plainly err in admitting the statements Mr. Bradshaw made to the officers and the radio transmitter that was found in his car. Mr. Bradshaw's third point is denied.

The judgment of the trial court is affirmed.

SPINDEN, C.J., ULRICH, SMART, NEWTON, HOLLIGER, and HARDWICK, JJ., concur.

LOWENSTEIN, J., dissents in separate opinion.

ELLIS, EDWIN H. SMITH, and HOWARD, JJ., concur in dissent of LOWENSTEIN, J.

LOWENSTEIN, Judge.

I respectfully dissent, and would reverse and remand the case because the defen-
dant's second point relating to his timely filed request for change of venue is dispositive. My position can be summarized as follows: Bradshaw filed a timely joint application for change of judge and change of venue. It is undisputed that if filed individually (and timely), both of these motions are to be granted automatically. Although Bradshaw complied with the timeliness aspect, only his request for a change of judge was granted. As such, Bradshaw is entitled to a new trial because his timely motion for a change of venue was denied.

The majority opinion is well reasoned; however, it does not overcome several key hurdles:

1) The majority, *sua sponte*, raises and then determines that the applicable rule is 32.08 rather than 32.03. Under Rule 32.03(c), upon a timely application for a change of venue, "the court immediately shall order the case transferred." Under Rules 32.08(c) and (d), the new judge merely "shall determine the request for change of venue." Neither party raised Rule 32.08, and instead concentrate on prejudice resulting from the denial of the change of venue. Though Rule 32.08 seems to apply here, the majority's first-impression analysis is questioned for failing to reconcile the timeliness aspect of Rule 32.03 with Rule 32.08. In effect, the majority allows the State to deprive Bradshaw of his right to a change of venue because he chose to file both for a change of judge and a change of venue.

2) The majority rules that the defendant waived his constitutional due process arguments and bases that holding on several cases relating to a prior version of the Speedy Trial Act. The old version of that Act contained a

180–day time limitation for starting a trial, and, in that narrow context, the start of trial meant the swearing of the venire. Not only has that Act been gutted, but also the accompanying cases relied upon by the majority are inapposite because the Act contemplated a specific time for the State to start a trial. The Rules contemplate immediate action on the part of the trial judge in ruling on a change of venue request.

3) The majority reasons that there is less potential for prejudice in a change of venue based on statutory right than based on cause, and cites cases for the proposition that right to a change of venue can be waived. This court should not speculate about the "potential for prejudice" where the necessary rule-based requirement of immediacy on the part of the judge was ignored.

There can be no quibble that the defendant's motion for change of venue could have been waived. There is a supportable argument that the language in Rule 32.03 puts the onus on the prosecutor or the trial judge to confront the defendant as to this live issue. I would argue that the proper time to have put the defendant's feet to the fire on his motion not having been ruled upon would have been prior to seating of the sworn jury. If 32.08 is read alone, because this was indeed a dual request, then there was nothing in place at the time the defendant renewed the motion to apprise him, as this court now does, that, because he also asked for a change of judge, he lost the protection he had under 32.03.

The only real issue here, no matter which rule applies, is when a waiver of the right to change of venue occurred. To now pick an arbitrary time based on authority interpreting long-extinct portions of a speedy trial statute is unfair. The

motion was in proper order, and, as in Rule 32.07 cases interpreting the disqualification of a trial judge, the court's duty was to sustain the motion. *State v. Cella,* 976 S.W.2d 543, 550 (Mo.App.1998); *State v. Boyd,* 927 S.W.2d 385, 388 (Mo.App. 1996); *State ex rel. Mountjoy v. Bonacker,* 831 S.W.2d 241, 244 (Mo.App.1992); *State v. Hornbuckle,* 746 S.W.2d 580, 584 (Mo. App.1988).

Defendant's trial counsel was not the same counsel who initiated the pre-trial motion several months earlier. There seems to be no sandbagging in this case; rather, it appears everyone missed the motion for change of venue. It is a small price to say no waiver occurs until the defendant is put in jeopardy. I would reverse and remand.

SMITH, HOWARD and ELLIS, JJ., concur with dissent.