

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED99980 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court of |
| | ) | City of St. Louis |
| vs. | ) | |
| | ) | Honorable Margaret M. Neill |
| MICHAEL FORD, | ) | |
| | ) | |
| Defendant/Appellant. | ) | Filed:  July 22, 2014 |

### INTRODUCTION

Michael Ford appeals the trial court's judgment of conviction of one count each of first-degree robbery and armed criminal action.[1] Ford contends that the trial court erred by denying his motion to suppress physical evidence seized by police at the scene of his arrest and incriminating statements he made thereafter. This Court disagrees. In this case, the police officer questioned Ford before the officer completed the stated purpose of his initial investigatory stop, and Ford's evasive answers provided the officer with reasonable suspicion to continue detaining him.

---

[1] In violation of §569.020, R.S.Mo. (2000), § 571.015, R.S.Mo. (2000) respectively. All statutory references are to RSMo  2000, as amended, unless otherwise indicated.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts, stated in the light most favorable to the verdict, are not in dispute.[2] On October 11, 2011, at approximately 2:00 in the morning, Officer Trevor Voss of the St. Louis County Police Department was on a "routine patrol" when he observed a white Chevrolet Malibu containing three occupants drive by his patrol car. The officer later testified that he began following the Malibu because it had no license plates and was in an area where "[s]tolen cars are a problem." While driving behind the Malibu, the officer observed a piece of paper in the rear window which he thought might have been a temporary tag. Officer Voss stated that he was not able to read the tag, however, due to poor street lighting and the tinted rear window of the Malibu. The officer later testified that a "common tactic . . . for people to steal vehicles is to just put something up there [in the window]." To investigate, Officer Voss activated the lights and siren of his patrol car, prompting the driver of the vehicle to pull over.

As the officer approached the vehicle on foot, he saw that the Malibu's temporary tag was from Illinois and that it was current. He wrote down the information on the tag and approached the driver's window. The officer informed the driver, Brishae Deal, of the reason for his stop and requested her identification. Deal told the officer she had recently bought the car and began searching her purse for identification. While Officer Voss waited for Deal to produce her information, he requested and received identification from the front seat passenger, Rayford Marion. Deal then informed the officer that she could not find her identification, but told him her identifying information, which he wrote down.

---

[2] Ford does not challenge the sufficiency of the evidence to support his convictions.

The officer next asked Ford, who was sitting in the back seat, for identification. Ford stated his name was "Kevin Ford" and quickly told Officer Voss his date of birth was "1-95-64." The officer testified that he understood "there aren't 95 days in January," and later, "when [Ford] said January 95th, 1964," the officer had a "pretty good idea that he was lying to me," so he asked Ford to repeat his birthday. The second time Ford stated that his date of birth was "1-5-1994." When asked a third time, Ford stated his date of birth was "1-5-1991." Ford also claimed ignorance of his own social security number. At trial, the officer testified that Ford did not make eye contact and appeared nervous during this initial exchange. The officer testified that due to Ford's inconsistent answers he could "tell something [was] not right" because "everybody knows their date of birth." The officer also noticed a black leather purse on the seat next to Ford. The officer wrote down the information Ford gave and returned to his patrol car to verify the identities of the Malibu occupants. He also radioed for assistance, because he "believe[d] that [Ford was] lying to him."

The assist cars arrived while Officer Voss was checking the vehicle occupants' records. The officer confirmed Deal's and Marion's identifying information, but found no record for a "Kevin" Ford. As a result, Officer Voss, along with two other officers, proceeded "straight to the driver-side rear door" and requested Ford step out of the vehicle because, the officer stated, it was "obvious" that Ford had lied. As Ford stepped out, Officer Voss noticed that the black purse had been moved to the floor, further heightening the officer's suspicions. He confronted Ford, and accused him of lying about his identity. Ford admitted he had lied and then provided his real name, a valid date of birth, and his social security number. Officer Voss handcuffed Ford and asked him why

he had lied. Ford replied he thought he might have outstanding warrants. Officer Voss placed Ford in the back of his patrol car and ran a record check, but found no outstanding warrants.

The officer then approached the remaining occupants, Deal and Marion, to inquire about the purse in the back seat. The officer requested permission from Deal to search the Malibu. Deal consented and Officer Voss began his search by looking through the purse in the back seat. Inside, the officer found a gun along with various identification cards of a woman, Y.C.

Officer Voss returned to his patrol car to question Ford about the contents of the purse. After the officer read Ford his *Miranda*[3] rights, Ford indicated he wished to talk. Ford initially denied any knowledge of the purse. After additional questioning, however, he claimed to have found the purse by a dumpster in the City of St. Louis. Officer Voss informed Ford that he was under arrest for "interfering with the duties of a police officer" and "unlawful use of a weapon." Before transporting Ford to the local precinct, Officer Voss ran a record-check on the Malibu's temporary tags, which confirmed their validity. He then informed the remaining occupants of the Malibu that they were "free to leave." Officer Voss estimated that approximately forty-five minutes had passed from the time he initially stopped the vehicle until he informed Deal and Marion they could leave.

At the police station, Ford again waived his Miranda rights and agreed to answer questions. During the interrogation, Ford admitted robbing Y.C. at gunpoint, and taking the purse that Officer Voss later seized from the Malibu's back seat.

The State charged Ford with one count each of robbery in the first degree and armed criminal action. Ford waived his right to a jury trial. Before trial, Ford filed a

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

motion to suppress the physical evidence that Officer Voss seized during his search of the Malibu, as well as Ford's subsequent incriminating statements. Ford argued that Officer Voss unlawfully expanded the purpose of the stop by detaining Ford and the other occupants of the car, after the officer had already observed the valid temporary tags. The trial court took Ford's motion to suppress with the case, and denied the motion at the conclusion of the trial. The court found Ford guilty and entered a judgment of conviction of one count each of first-degree robbery and armed criminal action. The court sentenced Ford to concurrent terms of ten years for first-degree robbery and three years for armed criminal action. Ford timely appeals.

## STANDARD OF REVIEW

On review of a court's denial of a motion to suppress, "[t]his Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *State v. Lovelady*, No. SC93296, 2014 WL 1910241, at *2 (May 13, 2014) (quoting *State v. Grayson*, 336 S.W.3d 138, 142 (Mo. banc 2011)). "We will not reverse the trial court's decision on a motion to suppress unless it is clearly erroneous." *State v. Stevens*, 845 S.W.2d 124, 128 (Mo. App. E.D. 1993) (citing *State v. Milliorn*, 794 S.W.2d 181, 184 (Mo. banc 1990)). "This Court reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling, disregarding any contrary evidence or adverse inferences." *State v. Hillman*, 417 S.W.3d 239, 246 (Mo. banc 2013). We review the court's findings "only to see if they are supported by substantial evidence." *State v. Thomas*, 989 S.W.2d 605, 606 (Mo. App. E.D. 1999) (citing *State v. Stevens*, 845 S.W.2d 124, 128 (Mo. App. E.D. 1993)). "Whether reasonable suspicion exists is a question of

law that this Court reviews de novo." *Lovelady*, 2014 WL 1910241, at \*2 (citing *State v. Norfolk*, 366 S.W.3d 528, 534 (Mo. banc 2012)).

## DISCUSSION

In his sole point, Ford contends that the trial court erred by denying his motion to suppress and allowing the admission into evidence of: (1) the purse; (2) the contents of the purse, including the gun found in the purse; (3) testimony regarding the purse and its contents; and (4) Ford's subsequent statements, in violation of the Fourth and Fourteenth Amendments to the United States Constitution as well as Article 1, § 15 of the Missouri Constitution. We disagree.

"The Fourth Amendment protects the right of citizens to be free from unreasonable searches and seizures and it applies to state actors through the Fourteenth Amendment." *Lovelady*, 2014 WL 1910241, at \*2 (citations omitted). Article I, section 15 of the Missouri Constitution is coextensive with the Fourth Amendment, and we apply the same analysis under both provisions. *Grayson*, 336 S.W.3d at 151 n.4.

Applicable to our discussion in this case is the Fourth Amendment protection afforded against unreasonable seizures. A "seizure" occurs during a traffic stop by law enforcement officers "when the totality of the circumstances surrounding the incident indicates that a 'reasonable person would have believed that he was not free to leave.'" *State v. Ross*, 254 S.W.3d 267, 273 (Mo. App. E.D. 2008) (quoting *State v. Sund*, 215 S.W.3d 719, 723 (Mo. banc 2007)). Individuals riding in a vehicle are "seized" within the meaning of the Fourth Amendment, when a police officer stops the vehicle to investigate suspected criminal activity. *See State v. Martin*, 79 S.W.3d 912, 916 (Mo. App. E.D.

6

2002) (holding motorist and passengers stopped by a law enforcement officer are seized, "until it is perfectly clear" they are free to leave.)

Missouri courts apply the standard established by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968), to determine whether police conduct during an investigatory traffic stop comports with the Fourth Amendment prohibition against warrantless seizures. *Grayson*, 336 S.W.3d at 145. "A *Terry* stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop; it 'remains valid only so long as it is based on reasonable suspicion.'" *Lovelady*, 2014 WL 1910241, at *3 (quoting *Grayson*, 336 S.W.3d at 143). "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Grayson*, 336 S.W.3d at 145 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "A *Terry* stop is proper when: (1) the circumstances support a finding of reasonable suspicion justifying the initial stop and (2) the officer's actions were reasonably related in scope to the circumstances that justified the interference." *Lovelady*, 2014 WL 1910241, at *3 (citing *Terry*, 392 U.S. at 19-20); *State v. Waldrup*, 331 S.W.3d 668, 673 (Mo. banc 2011)).

A seizure under *Terry* is valid only so long as it is premised upon reasonable suspicion of criminal activity. *Grayson*, 336 S.W.3d at 143. Reasonable suspicion exists when "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *State v. Mack*, 66 S.W.3d 706, 709 (Mo. banc 2002) (quoting *Terry*, 392 U.S. at 30). We will find an officer's suspicion reasonable if the officer can "point to specific and articulable facts which, taken

7

together with rational inferences from those facts, reasonably warrant that intrusion." *Grayson*, 336 S.W.3d at 143 (quoting *Terry*, 392 U.S. at 21).

"If the detention extends beyond the time reasonably necessary to effect its initial purpose, the seizure may lose its lawful character unless a new factual predicate for reasonable suspicion is found during the period of lawful seizure." *State v. Slavin*, 944 S.W.2d 314, 317-318 (Mo. App. W.D. 1997). Thus, "[a]n officer may inquire into matters unrelated to the justification for the traffic stop, and such inquiries do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *State v. McCleary*, 423 S.W.3d 888, 894 (Mo. App. E.D. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

"When evaluating the validity of a *Terry* stop, the trial court must consider the totality of the circumstances." *Lovelady*, 2014 WL 1910241, at *3 (citing *Grayson*, 336 S.W.3d at 143). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Lovelady*, 2014 WL 1910241, at *3 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Ultimately, whether an officer lacked reasonable suspicion "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time . . ." *Maryland v. Macon*, 472 U.S. 463, 470-471 (1985).

Here, the parties agree that the officer had reasonable suspicion to make the initial *Terry* stop of the vehicle in which Ford was a passenger. Their dispute is over whether the officer had reasonable suspicion to continue the stop after observing the information on the temporary license tag affixed to the vehicle's rear window.

8

Ford argues that once Officer Voss read the temporary tags affixed to the rear window, the officer had fulfilled his stated purpose for the stop, "ending the constitutionally justifiable seizure." Ford contends that after this point the continued seizure of the Malibu occupants, including himself, became unlawful, and the officer's questions directed at him occurred during an unlawful seizure. Furthermore, Ford contends that his responses to those questions, as well as the subsequently discovered evidence, and his statements, were all derived from an illegal seizure and should have been suppressed. In support, Ford cites *State v. Martin*, 79 S.W.3d 912, and *State v. Taber*, 73 S.W.3d 699 (Mo. App. W.D. 2002).

The State responds that the trial court did not err because the police officer had "probable cause" to detain Ford when he provided "a false name and a non-existent date for his birthday." The State also seeks to distinguish this case from *Martin* and *Taber* based on Ford's evasive answers to the officer's questions.[4]

We find *Taber* and *Martin* distinguishable from the facts of this case and therefore not dispositive. *Taber* and *Martin* involved traffic stops by law enforcement officers that were premised solely upon the officer's mistaken belief that the vehicle stopped was not displaying proper licensing. *See Taber*, 73 S.W.3d at 701 (noting trooper stopped the defendant's vehicle solely because he believed the vehicle "did not have a front license plate or a license plate on the trailer it was towing."); *Martin*, 79 S.W.3d at 914 (noting the deputy sheriff stopped the vehicle defendant passenger was riding in

---

[4] Additionally, the State argues that the evidence seized from the vehicle did not violate Ford's Fourth Amendment rights because Ford "had no legitimate expectation of privacy in the vehicle," and Ford's subsequent statements were properly admitted because "and any statements made by [Ford] were [made] after he was advised of his *Miranda* rights."

9

solely because he thought it lacked proper tags). In each case, the officer's mistaken belief was immediately corrected after the officer observed the proper licensing while approaching on foot. *Taber*, 73 S.W.3d at 702 (observing the tags "which [the trooper] initially had been unable to see because of the trailer."); *Martin*, 79 S.W.3d at 914 ("Upon approaching the vehicle, [the deputy] saw a temporary tag displayed in the rear window that was fogged over."). Yet the officers in *Taber* and *Martin* extended the stop by approaching the vehicle and questioning its occupants, which led to the subsequent discovery of criminal activity unrelated to the purpose of the initial stop. *Taber*, 73 S.W.3d at 702 (following questioning and record-check, trooper arrested defendant driver for outstanding warrant, which led to discovery of additional incriminating evidence and defendant being charged with possession of a controlled substance with intent to distribute); *Martin*, 79 S.W.3d at 915 (following questioning deputy obtained consent from driver to search the vehicle, which led to deputy discovering drug paraphernalia on defendant-passenger's person).

On appeal, the defendants in *Taber* and *Martin* argued that their continued detention and questioning occurred during an unlawful seizure, because the officers had already fulfilled the stated purpose of the stop when they observed the vehicle's proper licensing, and the later discovered evidence should have been suppressed as fruits derived from an unlawful seizure. *Taber*, 73 S.W.3d at 703-704; *Martin*, 79 S.W.3d at 916. The appellate courts agreed, finding in both cases that the stops were based solely on the officers' mistaken beliefs that the vehicles displayed improper licensing. *Taber*, 73 S.W.3d at 704; *Martin*, 79 S.W.3d at 917. The purpose of each stop, therefore, had been fulfilled when they observed proper licensing, and the continued detention of the

defendants in each case was unlawful. *Taber*, 73 S.W.3d at 704; *Martin*, 79 S.W.3d at 917. As a result, the courts in both *Taber* and *Martin* held the incriminating evidence was discovered during an unlawful seizure, and should have been suppressed. *Taber*, 73 S.W.3d at 707; *Martin*, 79 S.W.3d at 917-918.

Ford analogizes the facts here to those in *Taber* and *Martin* and argues that "Officer Voss pulled over the Malibu because it appeared to be missing a license plate." However, this is not precisely the reason that the officer gave for pulling over the Malibu. Officer Voss never testified that he stopped the Malibu because of a mistaken belief regarding its licensing, nor did he state his *sole* purpose in stopping the vehicle was to read the temporary tag affixed to its rear window. Instead, Officer Voss testified that his attention was first drawn to the vehicle because: "It didn't have a license plate. *Stolen cars* are a problem in north county . . ." (emphasis added). He then testified that he began following the vehicle and observed "a piece of paper" in in the rear window that appeared to be a temporary tag, but he could not see it clearly. He further stated: "I saw a piece of paper in the window. A common tactic, I guess, for people to steal vehicles is to just put something up there." Consequently, he stopped the vehicle, and approached the occupants after writing down the temporary tag number. When asked at trial why he questioned the occupants, including Ford, after he had already observed the tag, the officer stated he wanted "to know who I'm – who I've got in front of me," and also wanted to "verify that [the driver] was telling me the truth."

Our standard of review is that, "[w]e may not reverse if the trial court's ruling is 'plausible in light of the record viewed in its entirety;' and this is true even where we believe we would have weighed the evidence differently if we had been sitting as the trial

11

court." *State v. Thomas*, 989 S.W.2d 605, 606 (Mo. App. E.D. 1999) (citing *State v. Talbert*, 873 S.W.2d 321, 323 (Mo. App. S.D. 1994)). Here, viewing the record in its entirety, we find the trial court could reasonably have concluded that the officer did not pull the vehicle over *solely* based on a mistaken belief as to validity of the temporary tags, or *solely* to read the temporary tag affixed to the rear of the vehicle. Rather, the totality of the circumstances supports the conclusion that the officer pulled the vehicle over to investigate whether it was stolen, and the officer stated that he had not concluded this investigation when he began questioning Ford. Furthermore, since the driver failed to produce identification, the officer's brief inquiry into the identity of the occupants of the vehicle was appropriate. *See United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002) (recognizing the Fourth Amendment permits "[a] police officer [to] undertake similar questioning of the vehicle's occupants to verify the information provided by the driver." (citing *United States v. Foley*, 206 F.3d 802, 805 (8th Cir. 2000))); *United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004) (recognizing officers may briefly question passengers in a vehicle they suspect is stolen). Thus, the officer's stated purpose in conducting the stop had not yet been achieved when he requested Ford's information, and his questioning of Ford was reasonably related in scope to the purpose of the stop, particularly in light of the driver's failure to produce identification or evidence that she owned the car.

Thereafter, because Ford provided Officer Voss with information which the officer quickly recognized as false, we agree with the State that Officer Voss was justified in extending the stop under *State v. Bizovi*,[5] 129 S.W.3d 429 (Mo. App. E.D.

---

[5] To the extent the State argues that the officer had "probable cause" to extend the search under *Bizovi*, this is a misstatement of law. "There are three categories of police-citizen encounters: (1) an arrest

12

2004). *See also Lovelady*, 2014 WL 1910241, at *4 (recognizing totality of facts provided objective basis for reasonable suspicion of criminal activity and justified further detention even *after* initial investigation concluded). *Bizovi* supports the proposition that the seizure of a person may be extended, if a new factual predicate for reasonable suspicion of criminal activity develops *during* a lawful stop. *Id.* at 433 (holding the detention of a driver beyond the initial stop was justified because it was "based on facts learned during the initial stop, and [the defendant]'s nervousness was not the only significant factor supporting the detention.").

Here, Officer Voss testified that when he inquired into Ford's identity, Ford appeared nervous and failed to make eye-contact; he provided three widely inconsistent dates of birth, one of which was clearly false; he stated he could not recall his own social security number; and a check into his identity revealed that he had provided a false name. Thereafter, Ford admitted lying to the officer. These facts are sufficient to support a reasonable suspicion of criminal activity during the period of lawful detention and justified extending the investigation. *See Thomas*, 989 S.W.2d at 607 (recognizing "[i]f the results of an initial lawful encounter arouse further and reasonable suspicion in a police officer's mind, then he is entitled to" investigate those suspicions); *State v. Crabtree*, 398 S.W.3d 57, 59 (Mo. App. W.D. 2013) ("Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))).

---

requiring probable cause, (2) an investigative detention requiring only reasonable suspicion based upon specific articulable facts, and (3) a consensual encounter." *See United States v. Mendenhall*, 446 U.S. 544 (1980); *Dunaway v. New York*, 442 U.S. 200, 208-209 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-882 (1975). *Bizovi* discusses the second category, that is, whether facts articulated by an officer justify the extension of an investigative detention. 129 S.W.3d at 432. In contrast, the probable-cause standard requires more than reasonable suspicion to support a defendant's detention. *See Id.* at 433 (distinguishing the probable-cause standard).

Thus, the trial court had a sufficient basis for finding that the officer's continued detention of Ford was lawful and the evidence and statements derived from this detention were properly admitted into evidence at trial. Accordingly, the trial court did not err in denying Ford's motion to suppress. Point denied.

## CONCLUSION

For the foregoing reasons we hold the officer in this case was justified in initiating the stop and his subsequent actions were reasonably related in scope to the circumstances which justified the officer's interference in the first place. We affirm the judgment of the trial court.

_____
Lisa S. Van Amburg, Presiding Judge

Patricia L. Cohen, J., and
Philip M. Hess, J., concur.

14