

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, | ) |
| | ) |
| Respondent, | ) |
| | ) WD76129 |
| v. | ) |
| | ) OPINION FILED: |
| | ) July 14, 2015 |
| ISAAC PERDOMO-PAZ, | ) |
| | ) |
| Appellant. | ) |

**Appeal from the Circuit Court of Clay County, Missouri
The Honorable Anthony Rex Gabbert, Judge**

**Before Special Division:** Mark D. Pfeiffer, Presiding Judge,
Gary D. Witt, Judge, and Zel M. Fischer, Special Judge

Mr. Isaac Perdomo-Paz ("Perdomo-Paz") appeals from the judgment of the Circuit Court of Clay County, Missouri ("trial court"), upon his conviction by a jury of two counts of the class A felony of murder in the first degree, § 565.020;[1] one count of the class A felony of murder in the second degree, § 565.021; and three counts of the unclassified felony of armed criminal action ("ACA"), § 571.015. Perdomo-Paz was sentenced by the trial court to life imprisonment without the possibility of parole on each of the first-degree murder counts, life

---

[1] All statutory references are to the Revised Statutes of Missouri 2000, as updated through the 2010 Cumulative Supplement.

imprisonment on the second-degree murder count, and fifty years imprisonment on each of the ACA counts, all sentences to run consecutively. We affirm.

## Facts and Procedural History[2]

On February 25, 2011, several groups of teenagers attended a party in Independence, Missouri. Armin Hamidovic drove seven others—his cousin Adnan Islamovic, Dejan Joksimovic, Carlos Herrera, Timothy Snell, Diana Madera, Georgette Mendez, and Karla Trejo. Irvin Elizondo drove his cousin, Omar Morales, followed by another cousin, Delfino Elizondo. Carlos Campos drove his brother, Jose. Perdomo-Paz, then eighteen years of age, drove Pedro Rodriguez and Itzel Amaro. After the party was broken up by police due to noise complaints, the group drove to Clay County, Missouri, and Hamidovic rented a second-floor room at a Red Roof Inn, where they drank and smoked marijuana.

Trejo was Perdomo-Paz's former girlfriend. She was flirting with Hamidovic and Joksimovic at the party. Witnesses noticed that Perdomo-Paz watched the flirting and become visibly angry. Herrera, Islamovic, and Snell left to get more marijuana. Perdomo-Paz wanted Trejo to leave the party with him, but Trejo refused. Perdomo-Paz grabbed Trejo by the arm and slapped her in the face. Hamidovic confronted Perdomo-Paz and yelled at him about his treatment of Trejo. When Hamidovic and Perdomo-Paz were face-to-face, Perdomo-Paz said, "What did you say?" and pointed a gun at Hamidovic's head. Hamidovic did not say or do anything. Perdomo-Paz shot Hamidovic in the forehead and again in the right cheek. Perdomo-Paz then shot Delfino Elizondo once in the head and shot Joksimovic twice, once in the neck and once in the back of the head. All three of the shooting victims died.

---

[2] We view the facts in the light most favorable to the jury's verdict. *State v. Olivas*, 431 S.W.3d 575, 577 n.3 (Mo. App. W.D. 2014).

Autopsies showed that each victim died as the result of gunshot wounds. Hamidovic had a contact gunshot wound to his left forehead and right cheek caused by a shot fired from two to three feet away. Joksimovic had a gunshot wound to the left back of his head and one to the left side of his neck. Elizondo had a single gunshot wound to his left temple.

At approximately 11:40 p.m. on March 2, 2011, Kansas City, Missouri, police officers Anna Marie Occhipinto and Steven Downing stopped a vehicle when a check of the license plate revealed that the car's registered owner had outstanding warrants. As Officer Downing got the driver's identification and eventually arrested him, Officer Occhipinto approached the passenger side of the vehicle where Perdomo-Paz was sitting and asked for his name and birthdate. Perdomo-Paz gave a false name and birthdate, which did not return any information when entered into the officers' computer system. After correcting what Perdomo-Paz presented as a spelling error on the fake name, Officer Occhipinto ran it through the computer database again, with no results. Officer Occhipinto asked Perdomo-Paz for his social security number, which he did not know, and his age, which he did not know. Officer Occhipinto testified that Perdomo-Paz visibly displayed nervous and evasive behavior during the stop.

When the law enforcement "paddy wagon" arrived to transport the driver to the police station, the officers escorted the driver into the police transport vehicle. Perdomo-Paz, though instructed not to do so, ran from the scene. He was apprehended by Officer Downing after a struggle and placed under arrest.

The next day, March 3, 2011, at the Clay County Sheriff's Department, Detective Ray of the Kansas City, Missouri, Police Department homicide unit, and Detective Allen of the Clay County Sheriff's Department investigation unit, conducted a videotaped interrogation of

Perdomo-Paz regarding the triple homicide. Perdomo-Paz repeatedly denied being at the Red Roof Inn, claiming that he went to the party in Independence and then went home.

The State charged Perdomo-Paz with three counts of murder in the first degree and three counts of ACA, alleging that Perdomo-Paz, after deliberation, knowingly caused the deaths of Hamidovic, Joksimovic, and Elizondo by shooting them. Pre-trial, defense counsel moved to suppress Perdomo-Paz's March 3, 2011 statement to the police and all evidence and testimony related to his detention and arrest. The trial court overruled the motions after an evidentiary hearing. The trial court denied Perdomo-Paz's motion for judgment of acquittal at the close of all the evidence.

The jury found Perdomo-Paz guilty of first-degree murder for the deaths of Hamidovic and Joksimovic, second-degree murder for the death of Elizondo, and three counts of armed criminal action. The trial court denied Perdomo-Paz's motion for new trial and motion for a parolable sentence. The trial court sentenced him to life imprisonment without the possibility of parole on each of the first-degree murder counts, life imprisonment on the second-degree murder count, and fifty years imprisonment on each of the ACA counts, all sentences to run consecutively.

On appeal, Perdomo-Paz asserts five points. In Points I, II, and III, he asserts that the trial court erred in overruling his motions to suppress and in admitting certain evidence at trial. In Point IV, he challenges the sufficiency of the evidence to prove deliberation in order to convict him for the first-degree murder charges. And in Point V, he raises a constitutional challenge to section 565.020.2, which mandates life without the possibility of parole for a *juvenile* defendant—which Perdomo-Paz was and is not. We affirm.

Additional facts relevant to the disposition of this appeal will be set forth in the analysis of the points to which they relate.

**Points I, II, and III**

**Standard of Review**

"Where a motion to suppress was overruled and the evidence was introduced at trial, appellate review considers the evidence presented both at the suppression hearing and at trial in determining whether the motion should have been granted." *State v. O'Neal*, 392 S.W.3d 556, 565 (Mo. App. W.D. 2013) (internal quotation omitted). Our review is limited to a determination of whether substantial evidence exists to support the trial court's ruling. *Id*. All evidence and reasonable inferences are viewed in the light most favorable to the trial court's ruling. *Id.* When deciding whether sufficient evidence supports the trial court's determination, we defer to the trial court's opportunity to determine the weight of the evidence and credibility of the witnesses. "When, however, the issue to be decided involves the constitutional protection against forced self-incrimination, our review of the trial court's ruling is a two-part inquiry: we defer to the trial court's determinations of witness credibility and findings of fact, but we consider the court's conclusions of law de novo." *Id.* (internal quotation omitted).

"The standard of review for the admission of evidence is abuse of discretion." *State v. Steele*, 314 S.W.3d 845, 850 (Mo. App. W.D. 2010) (internal quotation omitted). "This standard gives the trial court broad leeway in choosing to admit evidence; therefore, an exercise of this discretion will not be disturbed unless it is clearly against the logic of the circumstances." *Id.* (internal quotation omitted). Prejudice must be demonstrated before evidentiary error can result in reversal. *Id.*

**Points I and II**

In Perdomo-Paz's first and second points on appeal, he alleges that the trial court erred in overruling his motion to suppress and admitting at trial, in violation of his Fifth Amendment right to remain silent, his March 3, 2011 statement made to law enforcement while in custody. In his first point, he contends that he unequivocally asserted his right to remain silent, but Detectives Ray and Allen continued to question him. In his second point, he asserts that he did not submit to questioning voluntarily, and Detectives Ray and Allen used coercive tactics throughout the interrogation.

**Analysis**

**Point I – Invocation of Right to Remain Silent**

The Fifth Amendment to the United States Constitution guarantees that no person can be forced to act as a witness against himself in a criminal case; and if a person being questioned by law enforcement indicates that he does not wish to answer questions, the questioning must cease, regardless of questions he may have answered or statements he may have already made. *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct 1602, 1612, 16 L.Ed.2d 694 (1966). Special legal language or exact references to rights guaranteed by the Constitution or amendments thereto are not necessary. *See Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct 2350, 2355, 129 L.Ed.2d 362 (1994). Conversely, one must unequivocally and unambiguously express a desire to remain silent so that an objectively reasonable officer in that situation would understand it to be a request to end questioning. *Id.*; *see also Berghuis v. Thompkins*, 560 U.S. 370, 381-82, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010). A suspect:

> must give a clear, consistent expression of a desire to remain silent in order to invoke his rights adequately and cut off questioning. If a person subjected to custodial interrogation wishes to revoke his or her waiver of the right to remain silent, he or she is under an obligation to communicate this revocation in a clear

and intelligible fashion. A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation. We consider the defendant's statements as a whole in determining whether they indicate an unequivocal decision to invoke the right to remain silent.

*O'Neal*, 392 S.W.3d at 569 (internal quotation omitted).

Perdomo-Paz contends on appeal that he invoked his right to remain silent by referencing, in isolation, his statement that he did "not for real, man, no, but . . ." want to answer questions about a homicide. He argues that this statement required Detective Ray to immediately cease her interrogation. But our Missouri Supreme Court has stated that it does "not read *Miranda* searching for out-of-context sentences that support a preferred outcome." *State v. Clemons*, 946 S.W.2d 206, 219 (Mo. banc 1997). "Instead, courts must look to the full context of a particular statement in order to determine whether a suspect invoked his rights or not." *O'Neal*, 392 S.W.3d at 569.

At the beginning of the interrogation, Detective Allen read Perdomo-Paz his *Miranda* rights. Perdomo-Paz signed a *Miranda* waiver and began talking to Detectives Ray and Allen. Detective Ray asked basic informational questions. She then told Perdomo-Paz that she and Detective Allen were conducting a homicide investigation:

> Det. Ray: Well, the reason we are talking to you, we're, uh, conducting an investigation, it's a homicide investigation. Okay, so, I just want to ask you a few questions about that. You cool with that?

> Perdomo-Paz: What is, I mean [unintelligible]. I mean, I don't know that . . .
> [several seconds of silence]

> Det. Ray: You fine with that, just talking about a homicide. Is that, is that . . . .

> Perdomo-Paz: I mean not, not for real, man, no, but . . . .

> Det. Ray: Why not?

7

> Perdomo-Paz: I mean because when Kansas tried to talk to me about a homicide, you know, . . . sometimes I couldn't even sleep . . . that I know who killed somebody. [parts unintelligible]

> Det. Ray: Okay, well, these are going to be easy questions, okay? Is that, is that fine? You okay with answering some easy questions? [several seconds of silence when Perdomo-Paz paused and then nodded his head affirmatively]

Detective Ray then began questioning him. Throughout the interrogation, Perdomo-Paz's story remained consistent: he went to a party on Noland Road in Independence at 9:30; "Carlos" drove him home; he was home by 1:00 a.m.; he stayed home the rest of the evening and did not go to any other parties that night.

Perdomo-Paz's response, "not for real, man, no, ***but*** . . ." to Detective Ray's question whether he was "fine" with talking about a homicide was not a clear and unequivocal assertion of the right to remain silent. As we have stated under a similar fact pattern:

> [A suspect's] use of the conjunction "but" is an equivocation, which suggests that he was experiencing an internal conflict: while he did not *want* to talk about what had happened, other factors compelled him to do so.

*O'Neal*, 392 S.W.3d at 570. And, in this instance, upon further elaboration, Perdomo-Paz explained how he was reluctant to talk about homicide investigations because of his previous negative experience when interrogated by Kansas detectives regarding a Kansas homicide. When Detective Ray followed up by asking if he would answer some "easy questions," he nodded affirmatively that he would. Later in the interrogation, Perdomo-Paz demonstrated that he knew exactly how to terminate the interrogation when he requested an attorney (at which point the interrogation was immediately terminated). Thus, taken in full context, Perdomo-Paz's isolated comment, "not for real, man, no, but . . ." did not constitute an unequivocal invocation of the right to remain silent.

8

Substantial evidence supported the trial court's denial of Perdomo-Paz's motion to suppress, and the trial court did not abuse its discretion in admitting at trial testimony about and a redacted videotape of Perdomo-Paz's statement.

Point I is denied.

## Point II – Voluntariness of Statement

Perdomo-Paz asserts that he did not voluntarily waive his right to remain silent in that the detectives used coercive tactics throughout his interrogation. When a defendant challenges the admissibility of a statement on the ground that it was involuntary, the State must prove voluntariness by a preponderance of the evidence. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). The test for the voluntariness of a statement is whether, under the totality of the circumstances, the defendant was deprived "of a free choice to admit, deny or refuse to answer the examiner's questions and whether the physical and psychological coercion was of such a degree that the defendant's will was overborne at the time he [made the statement]." *State v. Hicks*, 408 S.W.3d 90, 95 (Mo. banc 2013) (internal quotation omitted). Factors to be considered in reviewing the totality of the circumstances include: whether the defendant was advised of his *Miranda* rights and understood them; the defendant's physical and mental state; the length of questioning; the presence of police coercion or intimidation; and the withholding of food, water, or other physical needs. *Rousan*, 961 S.W.2d at 845. "Evidence of the defendant's physical or emotional condition alone, absent evidence of police coercion, is insufficient to demonstrate that the [statement] was involuntary." *Id.* No single factor is dispositive when the totality of the circumstances is considered, but the fact that the defendant voluntarily waived his *Miranda* rights is an important consideration. *State v. Barriner*, 210 S.W.3d 285, 300 (Mo. App. W.D. 2006).

9

Considering the totality of the circumstances, Perdomo-Paz's statement was not coerced. First, Perdomo-Paz was advised of his *Miranda* rights and signed a waiver, indicating that he understood them. Second, Perdomo-Paz claims that his statement was coerced because when he asked for water because his throat was dry and when he asked for a bathroom break, the detectives did not *immediately* give him water or allow him to use the restroom. However, shortly thereafter, the detectives gave him water and a bathroom break when he asked a second time. Third, the length of Perdomo-Paz's interrogation—three hours *with a break*—was not coercive. Missouri courts have held that *continuous* questioning for four hours is not coercive. *See State v. Phillips*, 319 S.W.3d 471, 477 (Mo. App. S.D. 2010) (citing *State v. Simpson*, 606 S.W.2d 514, 517 (Mo. App. W.D. 1980)). Fourth, while Perdomo-Paz told the detectives during the interrogation that he was tired and at times laid his head on his folded arms on the table, he did not demonstrate that he was so tired that he was unable to resist the questioning. A statement is not involuntary due to a defendant's tiredness when the interrogation is conducted at a reasonable time and the length of the interrogation is reasonable. *See Rousan*, 961 S.W.2d at 847. Additionally, the video recorded interrogation (which has been viewed by this Court) contradicts Perdomo-Paz's claims of exhaustion by showing he was sufficiently alert and energetic to actively participate in exchanges with the detectives. Fifth, Perdomo-Paz claims that Detective Ray made sporadic statements to him that were "aggressive and demeaning." The Missouri Supreme Court has held that tactics such as "yelling, 'getting in his face,' and misleading" a suspect about whether his accomplice was making a statement implicating him were not impermissibly coercive where the detectives did not touch the defendant or threaten him with any physical harm. *State v. Simmons*, 944 S.W.2d 165, 175-76 (Mo. banc 1997).

We conclude that none of the factors identified by Perdomo-Paz establish that he was deprived of his free choice to admit, deny, or refuse to answer the detectives' questions or that his will was overborne when he made the statement. To the contrary, after approximately three hours of questioning, Perdomo-Paz *never admitted wrongdoing*, maintaining throughout the interrogation that he was not at the scene of the homicides. That his will was not overborne by the allegedly coercive questioning is evidenced by the fact that he invoked his right to counsel to end the interrogation. Accordingly, substantial evidence supports the trial court's denial of Perdomo-Paz's motion to suppress, and the trial court did not abuse its discretion in admitting at trial testimony about and a redacted videotape of the statement.

Point II is denied.

## Point III

In Perdomo-Paz's third point on appeal, he alleges that the trial court erred in overruling his motion to suppress and allowing testimony at trial about his March 2, 2011 detention and arrest and in allowing testimony and evidence about his March 3, 2011 statement to police because his detention was not a consensual encounter; the stop exceeded its proper scope; and the police did not have probable cause to arrest him.

## Analysis

Warrantless seizures are generally unreasonable and, therefore, unconstitutional, unless an exception applies. *State v. Lovelady*, 432 S.W.3d 187, 191 (Mo. banc 2014). One common exception is the "*Terry* stop." *Id.* Officers are permitted to make a brief investigatory stop if they have a reasonable suspicion that illegal activity has occurred or is occurring. *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Under this exception, the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or

11

dispelling these suspicions." *Lovelady*, 432 S.W.3d at 191. Reasonable suspicion, which is a less stringent standard than probable cause, is present when "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Id.* (internal quotation omitted). "Suspicion is reasonable if the officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (internal quotation omitted). Whether reasonable suspicion exists is a question of law that we review *de novo*. *Id.* at 190.

"A *Terry* stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop; it remains valid only so long as it is based on reasonable suspicion." *Id.* at 191 (internal quotation omitted). "A *Terry* stop is proper when: (1) the circumstances support a finding of reasonable suspicion justifying the initial stop and (2) the officer's actions were reasonably related in scope to the circumstances that justified the interference." *Id.*

Reasonable suspicion justified the initial stop. At approximately 11:40 p.m. on March 2, 2011, Kansas City, Missouri, police officers Occhipinto and Downing stopped a vehicle when a check of the license plate revealed that the car's registered owner had outstanding warrants. "A 'seizure' occurs during a traffic stop by law enforcement officers when the totality of the circumstances surrounding the incident indicates that a reasonable person would have believed that he was not free to leave." *State v. Ford*, 445 S.W.3d 113, 119 (Mo. App. E.D. 2014) (internal quotation omitted). Passengers in a vehicle are "seized" within the meaning of the Fourth Amendment, when a police officer stops the vehicle to investigate suspected criminal activity. *Id.*

"If the detention extends beyond the time reasonably necessary to effect its initial purpose, the seizure may lose its lawful character unless a new factual predicate for reasonable

suspicion is found during the period of lawful seizure." *Id.* (internal quotation omitted). Thus, "[a]n officer may inquire into matters unrelated to the justification for the traffic stop, and such inquiries do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* (internal quotation omitted); *see also Rodriguez v. United States*, 135 S.Ct. 1609, 1615, 191 L.Ed.2d 492 (2015) ("Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop.") (internal quotation omitted). "When evaluating the validity of a *Terry* stop, the trial court must consider the totality of the circumstances." *Ford*, 445 S.W.3d at 119 (internal quotation omitted). "[T]he seizure of a person may be extended, if a new factual predicate for reasonable suspicion of criminal activity develops *during* a lawful stop." *Id.* at 122.

Here, in a reasonable period of time, the officers confirmed that the driver did, in fact, have outstanding warrants for his arrest, and the driver was placed under arrest. Additionally, as to Perdomo-Paz (a passenger in the vehicle), the officers reasonably asked him his name, social security number, and date of birth. *See Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185, 124 S.Ct. 2451, 2458, 159 L.Ed.2d 292 (2004) (after vehicle lawfully stopped, an officer's request for identification not violative of Fourth Amendment); *see also State v. Dixon*, 218 S.W.3d 14, 18 (Mo. App. W.D. 2007); *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985); *I.N.S. v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). Perdomo-Paz claimed not to know his social security number or date of birth, volunteering instead "20 maybe?" as a response. Further, on multiple occasions, Perdomo-Paz attempted to deceive the officers by providing a false identification which the officers could not confirm on their computer database. Perdomo-Paz's deceptive demeanor and

elusive responses provided a new factual predicate for reasonable suspicion of criminal activity for which further detention was warranted. And certainly, when Perdomo-Paz attempted to flee instead of remaining seated as instructed by the police officers, yet another factual predicate arose—this time justifying custodial arrest. For, when Perdomo-Paz fled, he had been under lawful detention. Accordingly, the evidence of his flight was admissible.

Next, Perdomo-Paz argues that the officers lacked probable cause to arrest him upon his attempted flee from the scene.

"For an officer to make a valid warrantless arrest, the officer must have probable cause to believe that the suspect has committed a crime." *State v. Bradshaw*, 81 S.W.3d 14, 31 (Mo. App. W.D. 2002). "There is no precise test for determining whether probable cause existed; rather, it is based on the particular facts and circumstances of the individual case." *Id.* (internal quotation omitted). "The facts and circumstances justifying probable cause must exist at the time of the arrest." *Id.* Absolute certainty is not required, but the officer's knowledge of the facts and circumstances must lead a prudent person to believe that the individual had committed or was committing an offense. *Id.*; *see also Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). "Probable cause need not rise to the level of actual guilt." *State v. Johnson*, 354 S.W.3d 627, 634 n.6 (Mo. banc 2011). Further, an officer's *subjective* reason for an arrest is not required to match the crime for which the *objective* facts create probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 594, 160 L.Ed.2d 537 (2004). In other words, an officer may arrest a person for a crime not supported by the objective facts at hand if those facts support probable cause for *a* crime—as long as the officer actually has knowledge of the facts at the time of the arrest. *See id.*

The police found Perdomo-Paz's evasive answers and flight suspicious. Based upon the facts and circumstances within the officers' knowledge—evasive self-identification responses, flight (after being instructed by the officers not to move from the scene), and physically struggling with the officer who apprehended him—the officers could reasonably conclude that Perdomo-Paz had engaged in or was engaging in criminal activity; though, clearly, Perdomo-Paz's lack of cooperation and flight prevented the officers from conducting a full investigation prior to his arrest. However, under these objective facts then within the officers' knowledge, it is not unreasonable to believe that Perdomo-Paz was, at minimum, committing the crime of resisting lawful detention, s*ee* § 575.150, RSMo, and his custodial arrest by the police officers was justified. That the officers initially arrested Perdomo-Paz pursuant to an unrelated and unsubstantiated municipal violation is of no consequence. *See Devenpeck*, 543 U.S. at 153.

Substantial evidence supported the denial of Perdomo-Paz's motion to suppress, and the trial court did not abuse its discretion in admitting at trial testimony about his detention and arrest.

Point III is denied.

**Point IV**

In Perdomo-Paz's fourth point on appeal, he argues that the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence, accepting the jury's verdict of first-degree murder, and sentencing him to life without parole, because the evidence was insufficient to establish that he deliberated before causing the deaths of Hamidovic and Joksimovic. We disagree.

15

**Standard of Review**

In reviewing the sufficiency of the evidence supporting a criminal conviction, this court's review "is limited to determining whether there is sufficient evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *State v. Porter*, 439 S.W.3d 208, 211 (Mo. banc 2014). "All evidence and inferences favorable to the State are accepted as true, and all evidence and inference[s] to the contrary are rejected." *Id.* We do not assess whether we believe that the evidence at trial established guilt beyond a reasonable doubt. *Id.* Rather, we determine "whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation omitted).

**Analysis**

Perdomo-Paz contends that the State failed to prove that he coolly reflected before shooting Hamidovic and Joksimovic. He argues that the evidence showed that he was not in a "cool frame of mind" but, instead, was embroiled in a confrontation with Hamidovic about how Perdomo-Paz had treated Trejo, and the shootings occurred before he had time to cool off.

"A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. "Deliberation" is defined as "cool reflection for any length of time no matter how brief." § 565.002(3). "Deliberation is not a question of time—an instant is sufficient—and the reference to 'cool reflection' does not require that the defendant be detached or disinterested." *State v. Nathan*, 404 S.W.3d 253, 266 (Mo. banc 2013). "Instead, the element of deliberation serves to ensure that the jury believes the defendant acted deliberately, consciously and not reflexively." *Id.*

16

Ordinarily, proof of deliberation is provided through the circumstances surrounding the crime. *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004). The jury heard evidence that Perdomo-Paz and Trejo had been boyfriend and girlfriend. At the Red Roof Inn, Trejo was flirting with Hamidovic. Joksimovic was sitting nearby, and one witness said that Trejo was also flirting with Joksimovic. Perdomo-Paz watched the flirting and was observably mad. He told Trejo that she was coming with him and grabbed her arm. She did not want to go and took his hand off of her. Perdomo-Paz grabbed her again. Two witnesses testified that Perdomo-Paz and Trejo were talking, and he slapped her in the face. Hamidovic confronted Perdomo-Paz about his treatment of Trejo and told Perdomo-Paz that Trejo did not want to leave with him. When Hamidovic and Perdomo-Paz were face-to-face, Perdomo-Paz said, "What did you say?" and pointed a gun at Hamidovic. Hamidovic did not say or do anything. Perdomo-Paz shot Hamidovic, shot Delfino Elizondo next, and then shot Joksimovic.

Deliberation may be inferred where a defendant brooded over his actions before taking them, where he had ample opportunity to terminate the crime, or where the victim sustained multiple wounds. *State v. Olivas*, 431 S.W.3d 575, 580 (Mo. App. W.D. 2014). "[D]eliberation need only be momentary." *Id.* When confronted by Hamidovic, Perdomo-Paz questioned Hamidovic before pointing a gun at him. Perdomo-Paz had ample opportunity to terminate the confrontation before shooting Hamidovic. After shooting Hamidovic, Perdomo-Paz could have stopped his attack, but instead, he turned his gun on Elizondo and shot him before shooting Joksimovic.

"Deliberation c[an] also be inferred from the number, severity, and location of wounds to the victim[s]." *State v. Smith*, 185 S.W.3d 747, 759 (Mo. App. S.D. 2006) (internal quotation omitted). Both Hamidovic and Joksimovic sustained *multiple* gunshot wounds. Hamidovic

17

sustained a contact range gunshot wound to his left forehead, meaning the end of the barrel was against the skin surface of the body, and a gunshot wound to the right cheek from a distance of less than two to three feet. Joksimovic sustained two gunshot wounds, one to the left back of his head and one to his left neck.

Leaving the scene immediately after the shooting and failing to seek medical help for the victims after the attack strengthens the inference that the defendant deliberated. *Olivas*, 431 S.W.3d at 580; *State v. Stubblefield*, 423 S.W.3d 311, 313-14 (Mo. App. E.D. 2014). Here, Perdomo-Paz fled the scene immediately after the shootings without seeking medical attention for the victims.

The foregoing evidence, and the reasonable inferences derived therefrom, was sufficient for a rational juror to find beyond a reasonable doubt that Perdomo-Paz deliberated before shooting Hamidovic and Joksimovic.

Point IV is denied.

**Point V**

In Perdomo-Paz's fifth point on appeal, he asserts that the trial court erred in overruling his motion for parolable sentences on the first-degree murder counts and sentencing him to life without parole on those counts in violation of his Eighth Amendment right to be free from cruel and unusual punishment because he was eighteen years old when the crimes were committed.[3]

---

[3] Perdomo-Paz appears to make an "as applied" challenge to section 565.020, arguing that the statute, as applied to him, violated his right to be free from cruel and unusual punishment. Thus, a preliminary issue is whether this court has jurisdiction to consider the constitutional challenge. The Missouri Supreme Court has exclusive jurisdiction in cases involving the validity of a state statute under article V, section 3 of the Missouri Constitution. However, a party's mere assertion that a statute is unconstitutional does not deprive the court of appeals of jurisdiction. *State v. Williams*, 420 S.W.3d 713, 717 (Mo. App. W.D. 2014). The allegation concerning the statute's constitutional validity must be real and substantial for jurisdiction to vest in the Supreme Court. *Id.* If the challenge is merely colorable, the court of appeals has jurisdiction. *Id.* A constitutional claim is:

> substantial when, upon preliminary inquiry, the contention discloses a contested matter of right, involving some fair doubt and reasonable room for controversy; but, if such preliminary inquiry

18

**Standard of Review**

Whether a sentence constitutes cruel and unusual punishment is an issue of law. *Cain v. State*, 859 S.W.2d 715, 718 (Mo. App. E.D. 1993). We review issues of law *de novo*. *State v. Triplett*, 355 S.W.3d 543, 550 (Mo. App. W.D. 2011).

"A trial court's sentencing decision is reviewed for abuse of discretion." *State v. Smith*, 422 S.W.3d 411, 420 (Mo. App. W.D. 2013) (internal quotation omitted). "An abuse of discretion occurs when the trial court's action is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful consideration." *Id.* (internal quotation omitted).

**Analysis**

The essence of this issue is whether Perdomo-Paz qualifies as a *juvenile* for purposes of the Eighth Amendment. Perdomo-Paz was born on April 21, 1992, and was eighteen years old when the crimes were committed. He argues that eighteen-year-olds lack the same maturity and sense of responsibility as seventeen-year-olds; therefore, a mandatory sentence of life without parole for someone convicted of committing homicide at age eighteen violates the Eighth Amendment of the United States Constitution and article I, section 21 of the Missouri Constitution. This argument has been rejected by the United States Supreme Court:

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach.

discloses the contention is so obviously unsubstantial and insufficient, either in fact or law, as to be plainly without merit and a mere pretense, the claim may be deemed merely colorable.

*State v. Stone*, 926 S.W.2d 895, 898 (Mo. App. W.D. 1996) (internal quotation omitted). The issues raised by Perdomo-Paz concerning the constitutionality of the sentencing provisions of the first-degree murder statute as applied to juvenile offenders in light of *Miller v. Alabama*, 132 S.Ct. 2455, 2463 (2012), and the sentencing procedures upon remand were decided by the Missouri Supreme Court in companion cases handed down on July 30, 2013: *State v. Hart*, 404 S.W.3d 232 (Mo. banc 2013), and *State v. Nathan*, 404 S.W.3d 253 (Mo. banc 2013). Because we determine that Perdomo-Paz's constitutional challenge is merely colorable, this court has jurisdiction. *See Austin W. Road Mach. Co. v. City of New Madrid*, 185 S.W.2d 850, 851 (Mo. App. 1945) ("No construction of the constitutional provision is called for, but merely its application. . . . Hence, this court has jurisdiction.").

> For the reasons we have discussed, however, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.

*Roper v. Simmons*, 543 U.S. 551, 574, 125 S.Ct. 1183, 1197-98, 161 L.Ed.2d 1 (2005). Missouri, in fact, has drawn the line between childhood and adulthood for adult criminal responsibility at age seventeen. *See* §§ 211.021.1(1), (2), 211.041. "Using chronological age as the touchstone for determining whether an individual is a juvenile or an adult is the standard approach in our legal system." *United States v. Marshall*, 736 F.3d 492, 499 (6th Cir. 2013). "Chronological age sets the boundaries for determining whether an individual is eligible to drive, vote, marry, buy and drink alcohol, be drafted, watch certain movies, and hold certain political offices." *Id.*

"[T]he Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions." *Roper*, 543 U.S. at 560. "Embodied in the Constitution's ban on cruel and unusual punishments is the precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Graham v. Florida*, 560 U.S. 48, 59, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825 (2010) (internal quotation omitted). Proportionality "does not require strict proportionality between crime and sentence but rather forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* at 60 (internal quotation omitted). "Gross disproportionality will be found only in exceedingly rare and extreme cases." *State v. Denzmore*, 436 S.W.3d 635, 644 (Mo. App. E.D. 2014) (internal quotation omitted). "A sentence within the range prescribed by statute generally will not be found excessive, or grossly disproportionate, to the crime committed." *Id.* (internal quotation omitted).

Perdomo-Paz was found guilty of first-degree murder under section 565.020, which in 2011[4] provided:

> 1. A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter.
>
> 2. Murder in the first degree is a class A felony, and the punishment shall be either death or imprisonment for life without eligibility for probation or parole, or release except by act of the governor; except that, if a person has not reached his sixteenth birthday at the time of the commission of the crime, the punishment shall be imprisonment for life without eligibility for probation or parole, or release except by act of the governor.

§ 565.020. "Substantial deference is due to the legislature's determination of proper punishment." *State v. Pribble*, 285 S.W.3d 310, 314 (Mo. banc 2009).

The United States Supreme Court held in *Miller* that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for *juvenile* offenders" when the sentencer has not considered an "offender's youth and attendant characteristics." *Miller v. Alabama*, 132 S.Ct. 2455, 2469, 2471 (2012) (emphasis added). In *State v. Hart*, 404 S.W.3d 232, 237-38 (Mo. banc 2013), a first-degree murder case involving a *juvenile*, the Missouri Supreme Court acknowledged and applied *Miller*'s holding in Missouri.

Here, simply put, Perdomo-Paz was *not* a juvenile at the time he committed the crimes. He was an adult. Neither the United States Supreme Court's holding in *Miller* nor the Missouri Supreme Court's holding in *Hart* is applicable.

The trial court sentenced Perdomo-Paz to consecutive terms of life imprisonment without the possibility of parole for the two first-degree murder convictions—permissible sentences for an eighteen-year-old for that crime. A mandatory life-without-parole sentence for an eighteen-year-old does not violate the prohibition against imposing such a sentence on a

---

[4] "[A] defendant will be sentenced according to the law in effect at the time the offense was committed unless a lesser punishment is required by a change in the law *creating* the offense itself." *Williams*, 420 S.W.3d at 717 n.8 (internal quotation omitted).

21

defendant *under* the age of eighteen. Furthermore, the record establishes that the trial court did, in fact, consider Perdomo-Paz's age and the severity of his crimes when determining his sentence. The trial court reviewed Perdomo-Paz's sentencing assessment report and, at the sentencing hearing, heard and considered comments from the victims' family members, the prosecutor, Perdomo-Paz's parents, and defense counsel, who requested that the court consider a parolable sentence based on Perdomo-Paz's age and for family reasons. The trial court found that Perdomo-Paz "intentionally and deliberately executed three young men for no reason other than what appeared to be a frustration over a former girlfriend" and imposed the permissible sentence of imprisonment for life without eligibility for probation or parole. § 565.020.2.

Based on our review of the record, we conclude that the trial court did not abuse its discretion in sentencing Perdomo-Paz in that the sentence was authorized by statute and was not disproportionate to the severity of the offenses Perdomo-Paz committed.

Additionally, the trial court retains discretion to order consecutive or concurrent sentences. § 558.026. Section 557.036.1 directs courts to "decide the extent or duration of sentence or other disposition to be imposed under all the circumstances, having regard to the nature and circumstances of the offense and the history and character of the defendant and render judgment accordingly." "When the sentence imposed is within the range prescribed by statute, it cannot be judged excessive, and the consecutive effect of the sentences does not constitute cruel and unusual punishment." *State v. Mort*, 321 S.W.3d 471, 485 (Mo. App. S.D. 2010) (internal quotation omitted).

Point V is denied.

**Conclusion**

The judgment of the trial court is affirmed.

Mark D. Pfeiffer, Presiding Judge

Gary D. Witt, Judge, and Zel M. Fischer, Special Judge, concur.